### In re Green Peak Estates

[577 A.2d 676]

No. 86-413

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed April 6, 1990

Motion for Reargument Denied May 17, 1990

*Abell, Kenlan, Schwiebert & Hall, P.C.*, Rutland, for Appellant.

*Witten, Saltonstall & Woolmington, P.C.*, Bennington, for Appellee Bennington County Regional Commission.

*Jeffrey L. Amestoy*, Attorney General, and *Mark J. Di Stefano*, Assistant Attorney General, Montpelier, for Appellee Agency of Natural Resources.

**Gibson, J.** Green Peak Estates, Inc., a real estate development corporation, appeals from the denial of Act 250 approval for the construction of Phase II and Phase III of its residential development in the town of Dorset. We affirm.

In October of 1982, Michael Bickford, a Connecticut real estate developer, was shown a 374-acre tract of land in Dorset by

a realtor. Bickford hoped to subdivide the land for residential purposes, and he returned to Vermont on weekends over the next several months to do research and to look at other properties in Dorset and neighboring towns. As part of his research, he familiarized himself with Act 250 and the town plan, and he spoke with members of the Dorset Planning Commission and the district Act 250 coordinator. Bickford also had topographic, road, and soil studies of the subject land prepared. In March of 1983, Bickford formed Green Peak Estates, Inc., with himself as president and sole stockholder; the corporation purchased the tract of land.

Although the town of Dorset has no formal review procedures for proposed subdivisions, Bickford continued to meet with the members of its Planning Commission while he developed a master plan for Green Peak Estates. On three occasions, Bickford attended Planning Commission meetings at which he presented his overall "conceptual development plan" and explained that it was to proceed in three stages. He also presented details of his plan for Phase I of the development.

In September of 1983, Bickford asked the Planning Commission for a letter certifying compliance with the town plan. On September 21 of that year, the chairman of the Commission notified Bickford by letter that the Commission had passed a resolution to the effect that Phase I of the development plan was generally in conformance with the town plan. The chairman noted some concerns, however, regarding any development above 2000 feet in elevation.

In September of 1983, Green Peak filed an application for a land use permit with the District Environmental Commission. The project was described as "a land subdivision for residential, detached homes on a 400 acre site," and the application stated that it was for "the first of several phases to improve the land with roads, utilities, septic fields, and minor landscaping." The application also indicated that nine lots were planned. Green Peak attached a supplemental half-page document entitled "Project Description" that provided further details regarding Phase I and some general observations as to acreages and elevations associated with Phases II and III. Another attached ex-

hibit, labeled "Conceptual Development Plan," was a drawing of the 400 acres divided into the three phases. Phase I and much of Phase II were laid out on this drawing, but only an access road was sketched out in the area designated as Phase III.

After notice and hearing, the Commission issued a written decision, prefacing its Findings of Fact and Conclusions of Law by noting the subject matter of the permit application:

> [A] project generally described as the subdivision of 33 acres of a 400+/- acre tract of land into 9 single family residential lots. . . . The proposed project would be constructed in three phases on 300+/- acres of the 400+/- acre tract. Phase I includes 33 acres with a total of nine lots. Phase II would develop 150+/- more acres; Phase III would access an additional 100 acres up to 2500 feet in elevation . . . . This application requests approval of Phase I only.

Among other aspects of its Act 250 analysis, the Commission concluded that the project conformed with the "local or regional plan," observing first that the Dorset Planning Commission had indicated conformance with the local plan and noting further that:

> The Bennington County Regional Planning Commission has indicated that the project is located in what the plan designates an "intermediate upland area" because it is between 1000' and 2500' elevation. The plan encourages open air uses and recommends avoiding development of slopes in excess of 20% while recognizing that development on slopes between 10% and 15% requires careful management, especially for erosion control and wastewater disposal.

The Commission issued the permit on March 15, 1984.

On June 21, 1985, Green Peak applied for Act 250 approval of Phases II and III of the development. Again, the three phases were discussed in the application. Initially, approval was sought only for the twenty residential lots planned for Phase II, and the application stated that approval of Phase III's eight lots would be sought later. An amended application was submitted on the same date, however, on which the words "Phase II and

Phase III" were handwritten and the number of lots was changed from twenty to twenty-eight.

Soon after this application was filed, the Dorset Planning Commission unanimously adopted a resolution stating that "in the opinion of the Planning Commission, Phase II of the Green Peak Estates development does not conform in important respects to the Town Plan." The Planning Commission referred specifically to the town plan's objective of keeping rugged and poorly accessible mountain and forest areas free from development.

On November 1, 1985, the District Environmental Commission denied the permit application with respect to both Phase II and Phase III. The sole ground for denial was criterion 10 of Act 250, that is, that the proposed development failed to conform with either the town or the regional plan. The Commission also imposed certain conditions under other Act 250 criteria.

In its appeal to the Environmental Board, Green Peak initially claimed error with respect to both the Commission's denial of the permit and the conditions it imposed. It later sought to withdraw its appeal with respect to the conditions. Other parties to the appeal objected, however, and the Board refused permission to withdraw those issues. The Bennington County Regional Commission, appearing as a party under statutory authority, asked that the Environmental Board first consider whether criterion 10, conformance with the town or regional plan, was met. In the absence of objection, the Board deferred action on the other Act 250 criteria and held a de novo hearing solely on the issue of compliance with criterion 10. The Board subsequently denied the permit application on the ground that Phases II and III did not conform with either the town or regional plan.

I.

Under criterion 10 of Act 250, a proposed subdivision or development must be "in conformance with any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). Where both a local and a regional plan are relevant to issues raised by a particular project and they are not in conflict, the Legislature has dictated

that the provisions of the regional plan are to be given effect. 24 V.S.A. § 4348(h)(1). Where the plans do conflict, the regional plan controls only if it is demonstrated that the project under consideration would have a substantial regional impact. *Id.* § 4348(h)(2).

The land in question is denominated "Intermediate Uplands" by the Bennington County Regional Plan, § 5.72. This section includes the following observations:

> Intermediate uplands . . . are generally found outside the rural areas and below the 2500' elevation. This area is generally characterized by grades in excess of 20%, absence of improved roads, and the absence of permanent structures for year-round or sustained use.

In a policy statement dealing with residential development, § 5.8 of the plan states: "Residential development should be carefully planned in areas where the natural slopes are greater than 15%. On slopes greater than 20%, residential development should not be permitted."

The Dorset Town Plan includes the corresponding objective of "[k]eep[ing] the rugged and poorly accessible mountain and forest areas free from development, reserved for forestry and other uses appropriate to their character."

The Board concluded that these provisions from the two plans are not in conflict. Although Green Peak asserts that the town plan alone should be considered, it does not challenge the Board's conclusion that no conflict exists. The analysis under criterion 10, therefore, properly begins with consideration of the regional plan.

■ The Board made specific findings, which are not challenged by Green Peak, pertaining to the slope of the proposed development, noting, for example, that of the twenty proposed lots in Phase II, "slopes appear to exceed 20% over more than one-half the area of at least 11 lots." Finding No. 9 summarizes this evidence:

> Thus, with the exception of the southerly portion of Phase III, the entire project area is characterized by slopes which exceed 20%. Those areas scattered throughout the site

which do not exceed 20% slopes fall within the 15 to 20% slope category and only a very small portion of the site consists of slopes of less than 15%.

Given the specific policy in the regional plan against residential development on slopes exceeding twenty percent, the Board's findings are sufficient to support its conclusion that the project does not conform to the plan. Cf. *In re Patch*, 140 Vt. 158, 167, 437 A.2d 121, 125 (1981) (trial court's ruling that proposed landfill failed to conform to regional plan in Act 250 proceedings held erroneous where evidence of nonconformance was insubstantial and regional plan encouraged sanitary landfill refuse disposal).

Green Peak contends, however, that the plan neither defines "residential development" nor indicates whether all development is to be excluded from such slopes. With respect to the definitional argument, we note that the permit application itself designates the project as a "residential subdivision." The developer's second argument is predicated on the assertion that only portions of each lot have grades in excess of twenty percent, and that the actual structures could be built on the less steep areas. Given the natural irregularity of the state's surface, this is likely to be true of any area that includes twenty percent slopes. We believe that the Board's commonsense interpretation of the plan's policy on this point is consistent with the overall approach to use of the region's intermediate uplands.

The Board also based its decision on other more general policies enunciated in the regional plan that it determined to be in conflict with the proposed development.[1] Green Peak argues

---

[1] The Bennington County Regional Plan enunciates four basic policies to control growth in areas designated as "intermediate uplands." First, it declares that "[o]pen air uses such as hiking, cross country skiing, snowmobile trails, horseback riding, and natural resource utilization such as logging, sugaring, etc. are the most appropriate activities for this planning area." Second, "[p]ermanent improvements such as roads and utilities that support sustained or year-round use should be discouraged." Third, "[i]ntensive recreation activities such as group camp sites are encouraged in areas with existing and suitable access." Fourth, the plan cautions that even those uses deemed "appropriate to intermediate uplands . . . should be sensitive to severe soil limitations to avoid erosion."

that these policies are so abstract that "conformance" with all of them as apparently required by criterion 10 of Act 250 is impossible and cannot be what the Legislature intended. Because we affirm the Board's decision on the narrow ground that the project failed to conform to the "slope" provision of the regional plan, we do not consider Green Peak's grievances over the more general, abstract policies in the plan. Similarly, we need not address the Board's determination that the project deviates from the regional plan's recommendations for development in urban, village, and rural residential areas and for design of access roadways. Our holding also renders consideration of the Dorset Town Plan unnecessary.[2]

## II.

Green Peak maintains that the Regional Planning Commission is estopped from asserting that Phases II and III do not conform with the regional plan.[3] This argument is based on the following propositions: that the Commission knew the ultimate scope of the subdivision at all times; that it possessed expertise concerning the meaning and effect of the regional plan; that Mr. Bickford was unaware of any nonconformance with the plan's policies; and that Bickford relied upon the Commission's lack of objection to the Phase I permit application to his detriment by proceeding to make expenditures in anticipation of approval of the other phases.

Similarly, Green Peak maintains that the District Environmental Commission was estopped from denying approval of Phases II and III after it had issued a permit for Phase I of the project with full awareness of the other phases.

■ Estoppels against government agencies "'are rare and are to be invoked only in extraordinary circumstances.'" *In re Conway*, 152 Vt. 526, 530, 567 A.2d 1145, 1147 (1989) (quoting

---

[2] Because we do not reach the issue of conformance with the town plan, we also decline to address the evidentiary questions that Green Peak raises with respect to that issue.

[3] Green Peak maintains that the town is similarly estopped from opposing the permit based on lack of conformance with the town plan. Because our decision does not rely on the town plan, we need not decide this issue.

*In re McDonald's Corp.*, 146 Vt. 380, 383, 505 A.2d 1202, 1203–04 (1985)). We agree with the Board that no estoppel has been established on this record.

It is clear from the record that Bickford's initial permit application—and the District Commission's subsequent approval—related solely to Phase I of the subdivision. The application explicitly stated that "[t]his application is for the first of several phases," and it referred to only nine lots. While an overall "project description" and a drawing of the project labeled "conceptual development plan" were attached, the plan gave details for Phase I only; for Phase III, the drawing showed nothing more than a sketched access road. The Commission's Findings, Conclusions, and Order stated expressly that the application sought approval of Phase I only. We agree with the Board, moreover, that none of the Commission's findings indicated either direct or tacit approval of the overall development plan.

To the extent that the Regional Planning Commission failed to object to the Phase I permit, "'silence without knowledge works no estoppel.'" *Laird Properties New England Land Syndicate v. Mad River Corp.*, 131 Vt. 268, 282, 305 A.2d 562, 570–71 (1973) (quoting 31 C.J.S. *Estoppel* § 88, at 495). The record includes no suggestion that the Regional Commission was aware of any facts relevant to the issue of conformance as it related to Phases II and III. In any event, the Regional Commission was not silent; instead, it sounded a clear warning that the project was located in an "intermediate upland area" and that the regional plan encourages open-air uses in such areas and recommends avoiding development of slopes in excess of twenty percent. The District Commission incorporated this cautionary statement into its conclusions of law.

Finally, as the Board noted, Bickford himself elected to restrict the application to Phase I. Under Board practice, he could have sought "Masterplan approval" of a conceptual nature for the entire project at the outset. In the alternative, he could have invoked Board Rule 21 to secure criterion 10 review for the entire project. "Courts will not predicate an estoppel in

favor of one whose own omissions or inadvertence contributed to the problem." *Town of Bennington v. Hanson-Walbridge Funeral Home, Inc.*, 139 Vt. 288, 294, 427 A.2d 365, 369 (1981).

## III.

The applicant did not request that the District Environmental Commission consider only criterion 10; therefore, the Commission analyzed proposed Phases II and III under each of the other Act 250 criteria. In the course of its analysis, it attached certain conditions to approval under some of these criteria, and Green Peak appealed the imposition of these conditions to the Board as well as the permit denial itself. Subsequently, after the time for filing an appeal had run, Green Peak sought to withdraw its appeal as to the conditions by filing a motion to dismiss. Other parties objected, and the Board denied the motion. Green Peak appeals that denial.

In considering the motion, the Board observed that, under its rules of procedure, the parties before the Commission are not required to file cross-appeals in order to participate in the de novo proceedings on appeal. Hence, the Board reasoned, "another party may have appealed one or more of these criteria had [Green Peak] not done so." Accordingly, the Board refused to dismiss the claims over the objection of those other parties.

■ Where an appeal of a ruling by the Commission is taken to the Board, the Board must "hold a de novo hearing on all findings requested by any party." 10 V.S.A. § 6089(a). In a de novo hearing, the tribunal hears the matter as if no prior proceedings had taken place. *In re Poole*, 136 Vt. 242, 245, 388 A.2d 422, 424 (1978). Because all of the evidence must be heard anew, *id.*, it follows that each of the original parties has the right to be heard. Although Board Rule 40(d) provides that "[i]f timely notice of appeal is filed by a party, any other party entitled to take an appeal . . . may file a notice of appeal," this rule is permissive, at least where the other party does not wish to address criteria other than those already noticed.

■ We hold that the Board correctly denied the motion to dismiss. To hold otherwise would encourage the filing of duplic-

itous appeals by parties seeking to avoid situations like that presented here.

*Affirmed.*