NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 114

No. 2015-454

| | |
|---|---|
| In re B&M Realty, LLC | Supreme Court |
| | On Appeal from<br>Superior Court,<br>Environmental Division |
| | June Term, 2016 |

Thomas G. Walsh, J.

Robert E. Woolmington of Witten, Woolmington, Campbell & Bernal, P.C., Manchester Center, for Appellant Two Rivers-Ottauquechee Regional Commission.

Bridget C. Asay, Solicitor General, and Elizabeth M. Tisher, Assistant Attorney General, Montpelier, for Appellant Natural Resources Board.

David K. Mears, Environmental and Natural Resources Law Clinic, South Royalton, for Amici Curiae Vermont Natural Resources Council and Preservation Trust of Vermont.

Nathan H. Stearns of Hershenson, Carter, Scott & McGee, P.C., Norwich, for Amici Curiae Bennington County Regional Commission, Central Vermont Regional Planning Commission, Northwest Regional Planning Commission, Southern Windsor County Regional Planning Commission, and Windham Regional Commission.

Paul S. Gillies of Tarrant, Gillies & Richardson, Montpelier, for Cross-Appellant B&M Realty, LLC.

PRESENT: Reiber, C.J., Skoglund, Robinson and Eaton, JJ., and Teachout, Supr. J., Specially Assigned

¶ 1.     **ROBINSON, J.** Appellants Natural Resources Board and Applicant Two Rivers-Ottauquechee (TRO) Regional Commission appeal the Environmental Division's award of an Act 250 permit to Applicant B&M Realty, LLC, to construct a large mixed-use business park near the

Interstate 89 Exit 1 interchange in the Town of Hartford. The trial court concluded that the project satisfied Act 250, including the requirement that it conform with the 2007 TRO Regional Plan. The Natural Resources Board and the TRO Regional Commission appeal, arguing that the project is inconsistent with mandatory and unambiguous provisions in the regional plan. Applicant cross-appeals, asserting that the 2007 Regional Plan does not apply, and that the Court need not consider the plan because the proposed development will not have substantial regional impact. We conclude that the 2007 Regional Plan applies and that the trial court's conclusion that the project will have substantial regional impact is supported by the evidence, but hold that the project is inconsistent with several provisions in the regional plan. We accordingly reverse.

I. Overview of Land Use Planning in Vermont

¶ 2. The Vermont Planning and Development Act, 24 V.S.A. ch. 17, governs municipal and regional planning in Vermont. The Act is intended to "encourage the appropriate development" of state lands by providing for a "coordinated, comprehensive planning process and policy framework" to guide decisions by municipalities, regional planning commissions, and State agencies. 24 V.S.A. § 4302(a), (b)(1). To that end, the Act provides for municipal planning commissions, id. § 4321 et seq., and creation of regional planning commissions by the act of voters or municipal legislative bodies, subject to State approval. Id. § 4341. The regional commissions are composed of at least one representative appointed from each member municipality. Id. § 4342. Those commissions are charged with, among other things, preparing regional plans consistent with the general goals of the Planning and Development Act articulated in § 4302. Id. § 4345a(5).

¶ 3. These broad land-use goals established by the Legislature include "maintain[ing] the historic settlement pattern of compact village and urban centers separated by rural countryside," discouraging "strip development along highways," and encouraging economic growth "in locally designated growth areas," or in "existing village and urban centers, or both." Id. § 4302(c)(1)(A)-(B). In addition to serving these goals, regional plans must identify land uses

2

within each region that will further the region-specific goals set forth in § 4347. Plans should also be "compatible with approved municipal and adjoining regional plans." Id. § 4345a(5).

¶ 4.    Regional plans provide a comprehensive framework for regional development. They must include, among other elements, "[a] statement of basic policies of the region to guide the future growth and development of land and of public services and facilities, and to protect the environment" as well as a "map and statement of present and prospective land uses." Id. § 4348a(1)-(2). Plans must also discuss regional energy needs, transportation issues, utility issues, and numerous other regional issues. Id. § 4348a(3)-(9). In this way, the plans serve to "guid[e] and accomplish[] a coordinated, efficient and economic development of the region" that will "best promote the health, safety, order, convenience, prosperity and welfare of the inhabitants as well as efficiency and economy in the process of development." Id. § 4347.

¶ 5.    The Act calls for "widespread citizen involvement" in the regional planning process. Id. § 4345a(5)(A). At the outset of the planning process and throughout the process, regional planning commissions are required to "solicit the participation of local citizens and organizations by holding informal working sessions that suit the needs of local people." Id. § 4348(a). The commissions must solicit comments from a range of identified stakeholders, and hold two or more public hearings within the regions on any proposed plans or amendments. Id. § 4348(b), (c). At least 60% of a region's commissioners representing municipalities must vote to adopt a regional plan before it can take effect. Id. § 4348(f).

¶ 6.    In furtherance of the Legislature's goal of a coordinated state planning process, both municipal plans and regional plans are made enforceable through Act 250. Thus, applicants who seek Act 250 permits must show that their projects are "in conformance with any duly adopted local or regional plan." 10 V.S.A. § 6086(a)(10). Regional planning commissions must assist district environmental commissions in assessing whether a project complies with a regional plan. 24 V.S.A. § 4345a(13). A regional plan's provisions will apply in Act 250 proceedings "to the

3

extent that they are not in conflict with the provisions of a duly adopted municipal plan." Id. § 4348(h)(1). If a conflict exists, the regional plan will be given effect if the project "would have a substantial regional impact." Id. § 4348(h)(2).

## II. Facts and Proceedings Below

¶ 7. Applicant owns three separately deeded lots covering 167.7 acres in Hartford. The property is located between U.S. Route 4 and Old Quechee Road near the north and southbound I-89 exit ramps. It is two miles away from Quechee Village and Quechee Gorge and five miles from White River Junction. The property is mostly undeveloped, although it presently contains a single-family dwelling and a 2433-square-foot commercial building. There are miscellaneous scattered businesses south of the property on U.S. Route 4, including a former real estate office and a country store with an upstairs apartment. There is a convenience store/gas station adjacent to U.S. Route 4 opposite the I-89 southbound ramp and U.S. Route 4 intersection.

¶ 8. Applicant proposes a development project designed as a mixed-use business park with office, retail, restaurant and residential uses to proceed in three phases. Phase 1 of the project contemplates a clustered mixed-use development encompassing more than 115,000 square feet of new construction on approximately 15.5 acres. The first construction cycle consists of 18,142 square feet of office space, 18,142 square feet of retail space, and a 5,667 square foot restaurant. The second cycle consists of 15,110 additional square feet of office space and 15,110 additional square feet of retail space, and nine residential units. The final construction cycle of phase 1 consists of 33,000 square feet of office space. Phase 2 consists of fifty residential units. The Phase 1 buildout includes approximately 2700 linear feet of internal roadway designed more or less as a loop, and the proposal contemplates a "center" that would mimic a small version of Church Street Marketplace in Burlington, Vermont.

¶ 9. In July 2005, applicant and then-landowners David and Ernest Punt sought to rezone portions of the Punt property and create a new zoning district, the Quechee Interstate

4

Interchange (QII). The municipal planning commission approved the zoning amendment in September 2005. In 2006, applicant presented a sketch plan to the municipal planning commission for the "Quechee Highlands Project."

¶ 10. The regional plan in effect at that time, the 2003 TRO Regional Plan, did not address the Town of Hartford because the Town joined the TRO Regional Commission in 2004, after the 2003 Regional Plan went into effect. In 2007, the TRO Regional Commission replaced the 2003 Regional Plan with the 2007 TRO Regional Plan, which did specifically address Hartford.

¶ 11. In May 2012, applicant sought zoning permits for its project from the Hartford Planning Commission. Applicant indicated its intent to develop approximately 120,000 square feet of commercial space and 10,000 square feet of residential space on its property. The planning commission approved the project in October 2012. Then, in December 2012, applicant sought an Act 250 permit. The district environmental commission unanimously denied its request, concluding, among other things, that the project failed to conform with the 2007 Regional Plan.

¶ 12. Applicant appealed to the Environmental Division of the Superior Court. Applicant first moved for partial summary judgment, asking the court to rule that the 2003 Regional Plan governed its Act 250 application. Applicant offered two grounds. First, it argued that its right to Act 250 review of its project pursuant to the then-existing regional plan vested in 2005 when it sought to amend local zoning bylaws. Alternatively, applicant asserted that its rights vested in 2006 when it shared a sketch plan with the municipal planning commission. The court rejected these arguments and concluded that applicant's rights vested in 2012 when applicant sought local zoning permits for its project. The court therefore conducted its Act 250 review under the 2007 Regional Plan.

¶ 13. Following a merits hearing, the court determined that the project complied with Act 250. The court's consideration of Criterion 10 of Act 250—whether the project is "in conformance

5

with any duly adopted local or regional plan," 10 V.S.A. § 6086(a)(10)—is at the heart of this appeal.

¶ 14. The threshold question before the trial court was whether a conflict existed between the municipal and regional plans, since, in the event of a conflict, the regional plan may only be given effect if the project would have a substantial regional impact. See 24 V.S.A. § 4348(h). Finding a lack of evidence in the record on the point, and noting that the applicant bears the burden of showing that the provisions of the plan do not conflict, the court assumed that a conflict existed between the municipal plan and the 2007 Regional Plan.

¶ 15. The court then considered whether the project would have a substantial regional impact. It first addressed applicant's assertions that by empowering regional commissions to define "substantial regional impact" without providing any specific standards, the Legislature had unconstitutionally delegated unconstrained discretion to the regional commissions. See id. § 4345a(17) (requiring regional commissions, as part of regional plan, to "define a substantial regional impact, as the terms may be used with respect to its region"). The court concluded that the applicable statutes collectively provide guidance to the regional planning commissions and noted that "substantial regional impact" is necessarily a region-specific concept best determined on a regional level. Ultimately, it decided that it was unnecessary to decide the delegation issue given its conclusion that applicant satisfied Criterion 10 in any event.

¶ 16. The court also considered and rejected applicant's argument that the TRO Regional Commission's definition of "substantial regional impact" did not provide a clear and applicable standard. It explained that the 2007 Regional Plan defined "substantial regional impact" as any development that met one or more of eight criteria, and the court found these criteria sufficiently clear to prevent discriminatory application and to provide adequate information to landowners. It was uncontested that the project as proposed would exceed 20,000 square feet and would require

6

substantial capital improvements of a local or State highway, and the court found that either of these facts would meet one or more of the criteria in the 2007 Regional Plan.

¶ 17.    Having concluded that the project must accordingly comply with the 2007 Regional Plan, the court turned to the terms of the regional plan, focusing on the following provisions:

> Principal retail establishments must be located in Town Centers, Designated Downtowns, or Designated Growth Centers to minimize the blighting effects of sprawl and strip-development along major highways and maintain rural character.
>
> [The] existing settlement pattern . . . provid[es] a system of centers both efficient and economical for the conduct of business enterprise and for the provision of social and community facilities and services.  This pattern must be protected and enhanced and is supported by state planning law.
>
> Any development planned for interchange development must be constructed to . . . discourage creation or establishment of uses deemed more appropriate to regional growth areas.
>
> Major growth or investments must be channeled into or adjacent to existing or planned settlement centers and to areas where adequate public facilities and services are available.
>
> [The Exit 1] interchange is not an appropriate location for a growth center.

¶ 18.    The court considered each provision separately.  It acknowledged that the first provision—dealing with principal retail establishments—contains mandatory language, but concluded that it did not apply.  The court construed the term "principal retail establishment" to mean a project where retail was the chief, leading, or most important use.  It reasoned that the project did not fall within this definition because less than 40,000 of 115,000 square feet of development would be devoted to retail space.  The court considered the next three provisions to be unenforceable either as aspirational policy statements or because they failed to provide adequate guidance or clear definitions of terms such as "major growth or investments," and "planned settlement area."  The court concluded that these standards gave unfettered discretion to the regional commission, and thus, could not be grounds for denying a proposed development.

¶ 19. The court concluded that the final provision prohibiting a "growth center" at Exit 1 was mandatory but inapplicable. It explained that the plan designated two types of growth centers: regional growth centers, "the traditional developed areas in the region," and designated growth centers, areas that a municipality seeks to designate as growth centers based on a number of criteria. The court noted that the project here was not located in an area where traditional development had occurred and that no party was seeking to have the project receive a growth center designation. The court thus concluded that the project conformed with the 2007 Regional Plan and that as long as applicant complied with conditions to mitigate traffic concerns, the project satisfied Act 250. This appeal and cross-appeal followed.

III. Applicability of the TRO 2007 Regional Plan

A. Vested Rights

¶ 20. We reject applicant's assertion on cross-appeal that the 2007 Regional Plan does not apply to its project. Applicant argues that it "started the process of obtaining a zoning permit" in 2005 by seeking to amend the town's zoning regulations, and it thereby acquired a vested right to use the 2003 Regional Plan for any Act 250 permit it might seek in the future. According to applicant, it diligently pursued its plans to develop its project after securing the zoning change.

¶ 21. Applicant provides no legal support for its position, and we find none. We agree with the trial court that this argument fails as a matter of law. See Richart v. Jackson, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000) (explaining that Supreme Court reviews summary judgment ruling using same standard as trial court; summary judgment appropriate when there are no genuine issues of material fact and any party is entitled to judgment as a matter of law).

¶ 22. As the trial court explained, Vermont follows the "minority rule" that a party obtains a vested right in existing regulations "as of the time when [a] proper [permit] application is filed." Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181, 436 A.2d 760, 761 (1981). The majority rule holds, by contrast, that "rights vest only if an applicant has both received a permit

8

and substantially relied on it in commencing work, or can show that an amendment was enacted to target its development." In re Keystone Dev. Corp., 2009 VT 13, ¶ 6, 186 Vt. 523, 973 A.2d 1179 (mem.) (citing Smith, 140 Vt. at 181, 436 A.2d at 761). Pursuant to the minority rule this Court adopted, a party's ability to rely on a particular zoning regime vests sooner than it would under the majority rule. We adopted this minority rule because we found it more practical to administer, it provided greater certainty, and it avoided extended litigation. Smith, 140 Vt. at 181-82, 436 A.2d at 761. We made clear that parties do not have an "open-ended right to 'freeze' the applicable regulatory requirements by proposing a development with inadequate specificity." In re Ross, 151 Vt. 54, 56, 557 A.2d 490, 491 (1989). Instead, a party must file a complete permit application before any rights will vest. Id. (concluding that applicant had no vested right in town plan in existence at time it filed incomplete application for Act 250 permit).

¶ 23. A request to amend a town's zoning regulations is not tantamount to filing a complete permit application for a particular project. We rejected a similar argument in In re Taft Corners Associates, 171 Vt. 135, 758 A.2d 804 (2000). In that case, a developer sought and received a municipal permit to subdivide land in 1987. Id. at 135, 758 A.2d at 805. In that application, the developer represented that its anticipated development would include mixed uses, retail and light industrial. Id. Following the subdivision permit, the developer made considerable investment in pursuing its development plans. Id. at 135, 758 A.2d at 806. In 1997, the town adopted an interim zoning amendment that changed the available uses in the area of the subdivided property. Id. at 136, 758 A.2d at 806. The developer subsequently sought a permit for a specific development, and argued that by virtue of the subdivision permit, it had a vested right to rely on the zoning regulations in effect at the time of that permit. Id. This Court rejected that argument, explaining:

> We have no doubt that a subdivision application creates a vested right that the subdivision permit be evaluated under the regulatory law in effect at the time of the application. That is the holding of

9

[Smith v. Winhall], and it is not under debate in this case. What [the developer] seeks, however, is a vested right that a separate zoning permit will be evaluated under the regulatory law in effect at the time of the application for the subdivision permit, and not that in effect at the time of the zoning permit application. We can understand this position if the legality of the act of dividing the parcel of land necessarily depends upon a specific provision of the zoning ordinance, and that zoning ordinance provision was amended before the zoning permit was sought. Thus, if the developer in Smith had been awarded a subdivision permit despite the fact that his lots were undersized, but had been denied a zoning permit because of the size of the lots, he should have had a vested right to the zoning permit provided he met all other zoning requirements. . . . Beyond this narrow circumstance, however, we believe [the developer's] position represents an unwarranted and unprecedented expansion of our vested rights jurisprudence. See L.M. Everhart Constr., Inc. v. Jefferson Cty. Planning Comm'n, 2 F.3d 48, 52 (4th Cir. 1993) ("no court . . . has adopted such a broad conception of vested rights").

In re Taft Corners Assocs., 171 Vt. at 139-40, 758 A.2d at 808-09 (footnote omitted). This is an easier case because here, although the developer describes steps that it took to pursue its development project (requesting a change in the municipal zoning requirements), it did not prior to 2012 file a permit application of any sort.

¶ 24. Nor do the facts that prior to 2007 applicant was taking steps to advance the development project, and that municipal leaders were aware of these efforts, give rise to a vested right in application of the 2003 Regional Plan. A mere "suggestion" to a municipality "that a property owner would like to undertake ill-defined work at an unspecified time" is insufficient to vest in a developer a right to rely on the then-existing regional plan for purposes of an application for a future Act 250 permit. In re Keystone Dev. Corp., 2009 VT 13, ¶¶ 5-6 (holding that developer acquired no vested rights in zoning ordinance where it did not submit a "full and complete" application for a zoning permit but merely alerted city officials that it intended to perform certain work on its property). As in Keystone, applicant's position here would create great uncertainty in the law and move us even further away from the majority rule. See id. ¶ 6 (explaining that without a proper application, one cannot know "what rights, exactly, had vested as to a particular party, or

10

when"). It is clear that applicant acquired no vested right in use of the 2003 Regional Plan for Act 250 purposes prior to the TRO Regional Commission's adoption of the 2007 Regional Plan.

¶ 25. We need not decide exactly when a party's interest in using a specific regional plan vests, whether it is when the applicant files a complete application for an Act 250 permit, or when a party files a complete application for a zoning permit associated with that project.[1] In either case, the zoning and Act 250 permit requests here were both made in 2012, well after the 2007 Regional Plan took effect.

### B. Substantial Regional Impact

¶ 26. We likewise conclude that because the project will have a substantial regional impact, the 2007 Regional Plan applies. Applicant argues the 2007 Regional Plan does not apply because the project will not have a "substantial regional impact." See 24 V.S.A. § 4348(h) (directing that to the extent a conflict exists between the regional plan and municipal plan, the regional plan shall be given effect "if it is demonstrated that the project under consideration in the proceedings would have a substantial regional impact"). Applicant acknowledges that its project falls squarely within the definition of "substantial regional impact" contained in the 2007 Regional Plan insofar as the project, among other things, contemplates commercial or industrial construction involving 20,000 square feet or more of gross floor area. It argues, however, that the Legislature

---

[1] We held in In re Molgano that where "a developer diligently pursues a proposal through the local and state permitting processes before seeking an Act 250 permit, conformance [with local and regional plans under criterion 10 of Act 250] is to be measured with regard to zoning laws in effect at the time of a proper zoning permit application." 163 Vt. 25, 33, 653 A.2d 772, 776-77 (1994). Given the rationale for this decision, it is not necessarily dispositive of the question of whether a proper zoning permit application vests the applicant's expectation in application of the then-existing regional plan for purposes of an Act 250 permit. Moreover, within the municipal zoning context we have held that an application for a subdivision permit does not create vested rights in application of those zoning laws to a distinct application for a development permit with respect to that same property. In re Taft Corners Assocs., 171 Vt. at 139-40, 758 A.2d at 808-09. These decisions leave unanswered the question whether it is the Act 250 application that vests in the applicant a right to rely on the existing regional plan for purposes of Act 250 review, or whether an application for a zoning permit for that project can have that effect.

11

improperly gave "complete and utter discretion" to regional commissions to define "substantial regional impact," and that the arbitrariness of the definition in the 2007 Regional Plan highlights the improper breadth of the Legislature's delegation. See id. § 4345a(17) (requiring regional commissions, as part of regional plan, to "define a substantial regional impact, as the terms may be used with respect to its region" and stating that commission's definition shall be given "due consideration" in state regulatory proceedings).

¶ 27. In support of its claim that the 2007 Regional Plan definition of "substantial regional impact" is arbitrary and unconnected to actual regional impacts of development, applicant describes a hypothetical scenario in which a development may exceed 20,000 square feet of commercial space without having any regional impact. In particular, it describes an antiques dealer who sells only through the internet and has a direct route to the post office with no neighbors who would be impacted by the limited truck traffic. Applicant further argues that the court was only required to give "due consideration" to the regional commission's definition of "substantial regional impact," was required to make an independent determination of such impact, and engaged in "rank speculation" by finding a substantial regional impact here.

¶ 28. We find these arguments without merit. First, there can be no claim of "unconstitutional delegation of legislative power" where a statute "establish[es] reasonable standards to govern the achievement of its purpose and the execution of the power which it confers." Vermont Home Mortg. Credit Agency v. Montpelier Nat'l Bank, 128 Vt. 272, 278, 262 A.2d 445, 449-50 (1970) (recognizing that "[w]ithin these limits," legislature "may confide a broad grant of authority to a subordinate agency in intricate matters affecting the general welfare in natural resources, health, education and economics"); see also Rogers v. Watson, 156 Vt. 483, 493, 594 A.2d 409, 415 (1991) (recognizing that delegation of discretionary authority is valid as long as Legislature provides "sufficient standard or policy to guide" agency's action). We conclude that the Vermont Planning and Development Act provides ample guidance to regional

12

commissions regarding the development of regional plans. See 24 V.S.A. ch. 17. The law identifies a legislative purpose for planning generally, id. § 4302, it lists specific goals with which regional plans must be consistent, id. § 4347, it identifies the duties of regional planning commissions and required elements for regional plans, id. § 4348a, and it provides procedural requirements for adopting plans, including the opportunity for public hearing and comment. Id. §§ 4392(a)-(e), 4345a, 4347, 4348a, 4348. Given this extensive statutory scheme, we reject applicant's unsupported suggestion that requiring regional commissions to define "a substantial regional impact" as part of developing its regional plan constitutes an unlawful delegation.

¶ 29. Moreover, applicant's second argument swallows up its first. As applicant contends, a regional commission's definition of "substantial regional impact" is not binding on the court; rather, it is entitled to "due consideration" in state regulatory proceedings. Id. § 4345a(17). Because the court retains ultimate discretion to determine a substantial regional impact with reference to the statutory framework and goals, subject to due consideration of a regional commission's own definition, the Legislature has not made the kind of wholesale delegation of legislative authority to the regional commissions that applicant suggests.

¶ 30. Finally, the regional plan contains various nonarbitrary provisions that the trial court concluded were sufficiently clear to prevent discriminatory application and that support the court's conclusion that the proposed project would have a substantial regional impact. As indicated above, the 2007 Plan states that a substantial regional impact exists for "commercial or industrial construction involving 20,000 square feet or more of gross floor area" and for projects that "necessitat[e] substantive capital improvements, such as widening or signalization of regionally significant local or State highways." These requirements are clearly defined and reasonable. It is not "rank speculation" to conclude that a project involving 115,000 square feet of commercial development at a highway interchange, and that requires a new traffic signal on a regionally significant roadway, as well as construction of additional turning lanes, will have a

substantial regional impact. Indeed, as the regional commission emphasized in the Plan, developments near highway exchanges are particularly suited for evaluation on a regional basis "given the considerable public investment in the interstate highway system and regional growth areas, and the significant public exposure to such areas." These areas are "powerful magnets for nonresidential uses" that "often compete[] with and erode[] regional growth areas."

IV. Conformance with the 2007 Regional Plan

A. Standard of Review

¶ 31. With respect to our standard of review, the interpretation of a regional plan is analogous to the interpretation of a zoning ordinance; it presents a legal issue that we review without deference to the trial court. In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 4, 195 Vt. 625, 93 A.3d 111 ("The Supreme Court reviews the environmental court's rulings on questions of law or statutory interpretation de novo." (citing In re Vill. Assocs. Act 250 Land Use Permit, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712)); see also In re Lathrop Ltd. P'ship I, 2015 VT 49, ¶¶ 21, 44, 121 A.3d 630 (explaining that proper interpretation of terms of zoning ordinance presents legal question, and question of whether project meets definition in ordinance is also subject to de novo review).[2]

---

[2] We stated in In re Chaves Act 250 Permit that "[w]e accord deference to the trial court's finding of conformity." 2014 VT 5, ¶ 38, 195 Vt. 467, 93 A.3d 69. That statement is inconsistent with our standard. See, e.g., In re JAM Golf, LLC, 2008 VT 110, ¶ 17, 185 Vt. 201, 969 A.2d 47 (rejecting environmental court's interpretation of municipal plan, and concluding, based on our own review, that particular provisions in plans could not be enforced). Moreover, it is inconsistent with our actual analysis in Chaves. See 2014 VT 5, ¶¶ 41-42.

Although we gave great deference to decisions by the former Environmental Board as "an agency charged with promulgating and interpreting its own rules," In re Vill. Assocs., 2010 VT 42A, ¶ 7 n.2, the Environmental Division "is part of the judicial branch," and "there is no separation-of-powers imperative for deferential review." In re Albert, 2008 VT 30, ¶ 6, 183 Vt. 637, 954 A.2d 1281 (mem.). Thus, we have stated "that where the outcome of the matter turns not on findings of fact, but on interpretation of a statutory term, and where we are not reviewing a decision by an agency charged with promulgating and interpreting its own rules, we employ the familiar de novo standard of review for matters of law." In re Vill. Assocs., 2010 VT 42A, ¶ 7 n.2. We clarify here that we review without deference the environmental court's interpretation of

## B. Merits

¶ 32. In determining whether a proposed project complies with Criterion 10 of Act 250—that is, whether it "[i]s in conformance with any duly adopted local or regional plan," 10 V.S.A. § 6086(a)(1)—a court must read the requirements of that plan in light of several considerations.

¶ 33. First, courts must strike a balance between the need for a plan to provide broad and flexible guidance with the need for clear requirements. We require plan provisions to be clear and definite to prevent arbitrary application and to provide adequate notice to landowners. In re JAM Golf, LLC, 2008 VT 110, ¶¶ 13, 17-19 ("We will not uphold a statute that fail[s] to provide adequate guidance, thus leading to unbridled discrimination by the court and the planning board charged with its interpretation." (quotation omitted)). Nonetheless, we do not require "mathematical certainty of language." State v. Danaher, 174 Vt. 591, 594, 819 A.2d 691, 695 (2002) (mem.); see also Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) (concluding that ordinance was not unconstitutionally vague because although language was "marked by flexibility and reasonable breadth, rather than meticulous specificity," it was clear what ordinance as a whole prohibited (quotation omitted)). Even in the context of municipal noise ordinances, we have recognized that "we are dealing with an area where some imprecision and generality is necessary and inevitable and our void-for-vagueness test is less strict where the regulation is economic and the landowner can seek clarification of its meaning or resort to administrative processes." In re Ferrera & Fenn Gravel Pit, 2013 VT 97, ¶ 16, 195 Vt. 138, 87 A.3d 483 (quotations omitted).

¶ 34. Additionally, a regional plan is not a municipal zoning ordinance and is likely to contain even less detail than a zoning bylaw. Zoning bylaws are designed to specifically "permit, prohibit, restrict, regulate, and determine land development," including specific uses of land;

the terms of a regional plan as well as its legal conclusion that a project does or does not conform to a regional plan.

15

dimensions, location, changes to and use of structures; and areas and dimensions of land to be used by structures or for other purposes. 24 V.S.A. § 4411(a). By contrast, regional plans are designed "to guide the future growth and development of land and of public services and facilities, and to protect the environment." Id. § 4348a(a)(1). They cover a much broader geographic area than municipal ordinances. And they serve a host of purposes—from informing consideration of Act 250 permit applications in cases like this to shaping highway projects to informing economic development plans.[3] The breadth of regional plans' application is not an excuse for imprecision, but it does shape reasonable expectations as to the level of detail in those plans. In short, we will enforce a provision in a regional plan where it is "sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed." Brody v. Barasch, 155 Vt. 103, 110, 582 A.2d 132, 137 (1990).

¶ 35.    Second, "broad policy statements phrased as nonregulatory abstractions are not equivalent to enforceable restrictions." Chaves, 2014 VT 5, ¶ 38 (quotation omitted). Thus, provisions that "recommend" or "encourage" certain uses are generally insufficient to create an enforceable obligation. See id. ¶¶ 40-41 (concluding that plan provision stating that mineral extraction "should minimize adverse effects on aesthetics and special community resources (such as historic sites) and should not interfere with or have negative impacts on historic sites" was "broad and nonregulatory, espousing general policies" without any "specific requirements that are legally enforceable"); see also In re John A. Russell Corp., 2003 VT 93, ¶ 19, 176 Vt. 520, 838 A.2d 906 (mem.) (concluding that plan that "discouraged" certain uses in particular area did not evince sufficiently "specific policy" against particular kind of development to support finding of nonconformity with town plan); In re MBL Assocs., 166 Vt. 606, 607-08, 693 A.2d 698, 700-01

---

[3] See 19 V.S.A. § 10c(a) (providing that Agency of Transportation may pursue exceptions to national standards for geometric design when appropriate to comply with local or regional plans as interpreted by the adopting entities); 32 V.S.A. § 5930a(c)(4) (directing Vermont Economic Progress Council to consider conformity with regional plans in awarding tax incentives).

(1997) (mem.) (concluding that use of word "should" in regional plan did not create mandatory enforceable requirement). Mandatory language includes terms like "must" and "shall" and it sets forth a requirement rather than a recommendation.

¶ 36. Third, in considering a provision's enforceability, we must view the provision in the context of the regional plan as a whole, bearing in mind the legislative goals that regional plans must serve. See In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13, 190 Vt. 132, 27 A.3d 1071 (explaining that in interpreting zoning ordinances, Court must "examine not only the plain language . . . but also the whole of the ordinance in order to try to give effect to every part, and will adopt an interpretation that implements the legislative purpose" (quotations omitted)); Williston Citizens for Responsible Growth v. Maple Tree Place Assocs., 156 Vt. 560, 563, 593 A.2d 469, 470 (1991) (holding that construction of ordinance "not limited to consideration of an isolated sentence . . . rather, we must look to the whole of the ordinance"). This does not mean that the aspirational goals of a plan as a whole can salvage a vague or aspirational provision, but it does mean that a court must view provisions with reference to the broader purposes articulated in the plan, especially where they are not internally inconsistent. See In re Tyler Self-Storage, 2011 VT 66, ¶ 13 (explaining that provisions should be construed "to determine and give effect to the intent of the drafters," and this intent "is most truly derived from a consideration of not only the particular statutory language, but from the entire enactments, its reason, purpose and consequences" (quotation omitted)); see also In re Green Peak Estates, 154 Vt. 363, 368-69, 577 A.2d 676, 679 (1990) (concluding that regional plan providing that residential development on slopes greater than 20% "should not be permitted" was sufficiently specific to be enforceable, and, while it did not explicitly state that all development was precluded, "Board's commonsense interpretation of the plan's policy" was "consistent with the overall approach to use of the region's intermediate uplands").

¶ 37.    With these principles in mind, we consider several salient provisions of the regional plan that individually, but, more importantly, in concert, establish that the project does not conform to the plan as required by 10 V.S.A. § 6086(a)(10).

1.   "Principal Retail Establishments"

¶ 38.    The 2007 Regional Plan states: "Principal retail establishments must be located in town centers, designated downtowns, or designated growth centers to minimize the blighting effects of sprawl and strip-development along major highways and maintain rural character."

¶ 39.    This language is mandatory and the proscription is clear: retail development must be limited to specified areas within the region to promote clearly identified land-use goals. There is no dispute that the proposed project is not located in a town center, designated downtown, or designated growth area.    Nevertheless, the trial court concluded that the proposed project conformed with this provision of the 2007 Regional Plan.   It viewed the mixed-use development project in its entirety as a single "establishment" and concluded that it was not a "principal retail establishment" because the project's total proposed retail square footage was not greater than the total square footage of any other use.

¶ 40.    We reject the trial court's construction of the regional plan on the basis of the plain language of the plan itself and because the court's construction of the "principal retail establishment" provision would lead to results squarely at odds with the purpose of the plan and the underlying enabling legislation.   The proposal in this case is for a mixed-use development— one that encompasses multiple primary or principal uses in multiple establishments.  As appellants' expert testified below, a principal retail establishment is an establishment where retail is the primary occupant of space in a building, as distinguished from an ancillary use.  See also 4 P. Salkin, American Law of Zoning § 41:16 (5th ed. 2015) (explaining that accessory use, unlike principal use, is "use of a building or structure which . . . is subordinate to or customarily incidental to the main use of the building and the permitted use of the zoning district in which it is located").

18

The trial court's approach of considering the proposed mixed-use project as a whole as a single establishment for purposes of this requirement is not supported by the plain meaning of "principal retail establishment."

¶ 41.    Moreover, the interpretation would yield a result at odds with the stated purposes of the regional plan itself.  A general goal outlined in the plan is preserving the existing settlement pattern consisting of "clusters of residences and other activities in the form of villages and hamlets surrounded by less dense settlement, rural in character, or large spaces in natural vegetation."  The plan explains that such a pattern of development has proven to be "of a sociological, psychological, and aesthetic benefit to the region, while at the same time providing a system of centers both efficient and economical for the conduct of business enterprise and for the provision of social and community facilities and services."  The plan promotes this goal by requiring "[m]ajor growth or investments [to] be channeled into or adjacent to existing or planned settlement centers and to areas where adequate public facilities and services are available" and specifically defines seven types of growth center in the region.  It further articulates a series of goals as promoting the public interest, including encouraging "full use" of regional growth areas, protecting the character of rural areas by avoiding sprawling development, and reserving land at interchange areas for the development of services for the traveling public and transport of goods, not for high traffic-generating commercial activities that are unrelated to services for the traveling public or trucking interests.  And the requirement that "principal retail establishments" be located in Town Centers, Designated Downtowns, or Designated Growth Centers was, by its own terms, designed to "minimize the blighting effects of sprawl and strip-development along major highways and maintain rural character."

¶ 42.    Under the trial court's interpretation, unlimited retail development could occur outside of growth areas consistent with the regional plan as long as such development was folded into even larger square footage development of other sorts.  This interpretation cannot be squared

19

with the clearly stated goals of the regional plan as a whole and the particular limitation on retail development. The trial court's interpretation would allow sprawl and strip-development, rather than minimize it, and thus cannot be squared with the regional plan as a whole. In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 23 ("We adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." (quotation omitted)). This project, which proposes to create a restaurant and almost 35,000 square feet of new retail space, clearly includes "principal retail establishments" as contemplated by the Plan, and thus squarely runs afoul of the requirement that "principal retail establishments" must be located in designated areas that do not include the site of this project.

2. "Regional Growth Areas"

¶ 43. As noted above, the regional plan seeks to limit "major growth or investments" into existing or planned settlement centers:

> Due to severe physical site limitations and the relatively high costs incidental to land development in certain areas as compared to others, much of the region is neither readily available nor suited for intense development. Major growth or investments must be channeled into or adjacent to existing or planned settlement centers and to areas where adequate public facilities and services are available. Regional Growth Areas are the traditional developed areas in the region. They are differentiated into the following seven types: Regional Center, Town Centers, Village Settlements, Hamlet Areas, Designated Growth Centers, Designated Downtowns, and Designated Village Centers as well as expansion areas that are designated to accommodate future growth based on the capacity to provide infrastructure and suitable land without threatening critical resources or creating sprawl.

Like the provision governing "principal retail establishments," this provision contains mandatory language. It requires major growth or investments to be located in specified areas.

¶ 44. The trial court recognized the mandatory nature of this provision but concluded that the "critical words are undefined and subject to interpretation," and thus, it could not "discern a specific policy" that prohibited this project. In particular, the trial court stated that terms "major

20

growth or investment" and "planned settlement area" were undefined, and their meaning was unclear so that this provision did not establish a clear, unqualified and unambiguous standard that could be enforced.

¶ 45. We disagree. Considering this language in the broader context of the regional plan, a reasonable person can discern what is prohibited. In the context of this case, the term "major development" is "sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed." Brody, 155 Vt. at 110, 582 A.2d at 137. A reasonable person would recognize that "major development" is large-scale development, including development with the potential to have a "substantial regional impact." A proposal that contemplates 115,000 square feet of new construction in a largely undeveloped area near an interstate exchange falls within a common-sense understanding of this term. As the NRB notes, moreover, this project represents a significant change to the existing landscape and contemplates a level of development much greater than the yearly average for the entire Town of Hartford between 1998 and 2005. The project at issue here is clearly "major development" as that term is commonly understood.

¶ 46. Nor is the requirement that major development be channeled into or adjacent to "existing or planned settlement centers and . . . areas where adequate public facilities and services are available" obscure in the overall context. Directly following this requirement, the regional plan identifies "regional growth areas" as the "traditional developed areas in the region," and categorizes these areas into seven types, recognizing as well "expansion areas that are designated to accommodate future growth." It is evident that the commission is referring to these areas as the "existing or planned settlement centers" appropriate for "major growth and development." A review of the more specific definition of each of these areas, stated elsewhere in the plan, underscores this conclusion. The plan recognizes, for example, that a regional center has existing public sewer and water utilities, as well as transportation infrastructure capable of handling

21

significant volumes of commuting and commercial traffic, and that "[m]ajor developments like large governmental, medical, commercial, industrial building must be located in Regional Centers where utilities, facilities, and human capital are concentrated." The Exit 1 interchange is not an "existing or planned settlement center" under the regional plan, and therefore, it is not an appropriate location for major development.

### 3. Development at Highway Interchange

¶ 47. Given that there are thirteen highway interchanges in this region, the plan also includes a general discussion of development at highway interchange areas. The plan states that it is in the public interest to "reserve land at Interchange Areas for the development of services for the traveling public and transport of goods, not for the development of high traffic-generating commercial activities that are unrelated to services for the traveling public or trucking industry, or institutional uses such as governmental offices or post offices." It cautions that "Interchange Area development should not be promoted to the detriment of regional growth areas or the public investments made therein." It reiterates that "[r]etail establishments providing goods and services to a regional clientele should be located in Regional Centers to minimize the blighting effects of sprawl and strip-development along major highways and to maintain rural character."

¶ 48. The plan identifies general highway interchange policies, indicating again that land uses planned for interchanges areas should "complement rather than compete with uses that exist in Designated Downtowns, Designated Village Centers, Designated Growth Centers, and other regional growth areas." It identifies specific uses appropriate for interchange development, which "include highway-oriented lodging and service facilities, trucking terminals, truck-dependent manufacturing, and park-and-ride commuter lots."

¶ 49. The plan then specifically states what is not appropriate: "Any development planned for interchange development must be constructed to . . . discourage creation or establishment of uses deemed more appropriate to regional growth areas." Specific to Exit 1, the

plan provides that "[t]his interchange is not an appropriate location for a growth center." The plan identifies the types of development appropriate for Exit 1 as "residential, appropriately-scaled traveler-oriented uses, and other similar uses that are not intended to draw on regional populations."

¶ 50.   The trial court turned this language on its head, concluding that because the project is not located in an area where traditional development has occurred and no party is seeking to have the project receive a formal growth center designation, the prohibition on growth centers at Exit 1 does not apply to the project. This ignores the obvious intent of the provisions above. The plan clearly and repeatedly states that the type of development that belongs in a regional growth center—which includes "[r]etail establishments providing goods and services to a regional clientele" and "major developments"—does not belong at the Exit 1 interchange. Applicant's proposed project is not transit-oriented, nor is it scaled to fit among the small, low-density residential and commercial structures that currently exist in this area. It is a "major development" that includes a significant retail component, which, as stated throughout this plan, must be channeled into or adjacent to planned settlement areas to "minimize the blighting effects of sprawl and strip-development along major highways and to maintain rural character."

¶ 51.   These provisions, all of which are clear and enforceable, reinforce each other in establishing a clear and mandatory framework for development. That framework does not authorize major development—including principal retail establishments—at this non-growth-center highway interchange major development, given that the development as proposed is not oriented to the traveling public or trucking industry. For these reasons, we conclude that the project does not satisfy the requirements of Criterion 10 because it does not conform with clear and enforceable provisions of the applicable regional plan. 10 V.S.A. § 6086(a)(10).

¶ 52.   The Legislature has made clear that regional plans are key to the "appropriate development" of state lands, 24 V.S.A. § 4302(a), with Act 250 serving as a critical enforcement

23

mechanism. Consistent with its statutory obligations, the TRO Regional Commission developed a comprehensive plan to guide development in its region. It repeatedly manifested its intent to prohibit large-scale development of this sort at the Exit 1 interchange, thereby serving key land-use goals identified by the Legislature: maintaining historic settlement patterns, discouraging strip development along highways, and encouraging economic growth in specific areas. Id. § 4302(c)(1). The TRO Regional Commission used language that is "clear and unqualified, and creates no ambiguity," Chaves, 2014 VT 5, ¶ 38 (quotation omitted), and thus, those standards must be enforced. Any other conclusion would undermine the continued viability of regional planning in this state. Applicant's proposal does not conform to the regional plan, and the trial court erred in concluding otherwise.

Reversed.

FOR THE COURT:

_____
Associate Justice

24