NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 52

Nos. 2019-185 & 2019-241

| | |
|---|---|
| Athens School District et al. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Franklin Unit, |
| | Civil Division |
| | |
| Vermont State Board of Education et al. | January Term, 2020 |

Robert A. Mello, J.

David F. Kelley, Craftsbury Common, Stephen F. Coteus and Nicholas A.E. Low of Tarrant, Gillies & Richardson, Montpelier, and Ines McGillion of Ines McGillion Law Offices, PLLC, Putney, for Plaintiffs-Appellants.

Thomas J. Donovan, Jr., Attorney General, and David Boyd and Eleanor L.P. Spottswood, Assistant Attorneys General, Montpelier, for Defendants-Appellees.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **REIBER, C.J.** Plaintiffs—a number of independent school districts, school boards, parents, students, and citizens—challenge the implementation of Act 46, as amended by Act 49, regarding the involuntary merger of school districts. The Legislature enacted those laws in 2015 and 2017, respectively, to improve educational outcomes and equity by designing more efficient school governance structures in response to long-term declining student enrollment and balkanized educational governance and delivery systems. In separate decisions, the civil division

dismissed several counts of plaintiffs' amended complaint and then later granted defendants'[1] motion for summary judgment on the remaining counts. In these two consolidated appeals, plaintiffs argue that: (1) the State Board of Education and the Agency of Education failed to carry out the plain-language mandate of Act 46; and (2) the Board's implementation of the law, as manifested in its final order, violated other statutes in Title 16 and several provisions of the Vermont Constitution. We conclude that the Agency's and Board's implementation of the law was consistent with the challenged Acts and other statutes in Title 16, did not result from an unlawful delegation of legislative authority, and did not violate any other constitutional provisions. Accordingly, we affirm the civil division's decisions.

I.  The Law

¶ 2.    Before addressing plaintiffs' arguments, we review the relevant law. In response to declining student enrollment and a large number of independent school districts, the Legislature passed acts in 2010 and in 2012 to incentivize voluntary mergers of school districts. See 2009, No. 153 (Adj. Sess.), §§ 1-4 (making legislative findings,[2] establishing voluntary school district merger program, and setting forth financial incentives for merging); 2011, No. 156 (Adj. Sess.), §§ 8, 13, 15-17 (amending Act 153 and establishing conditions for modified unified union school districts). The voluntary merger incentives available in these Acts led to a minimal decline in the number of school districts from 276 to 267. See D. French, Vt. Agency of Educ., Report on Act

---

[1] Defendants are the Vermont State Board of Education, members of the Board, the Vermont Agency of Education, and the Secretary of the Agency.

[2] The Legislature found that the voluntary merger of education governing units would increase educational opportunities for students, increase economies of scale, enhance cost efficiencies at a time of declining enrollment, and assist schools in obtaining standardized metrics for evaluating programs, identifying system improvements, and analyzing the costs and benefits of resource allocations. 2009, No. 153 (Adj. Sess.), § 1. The Legislature also found that encouraging voluntary merger of school districts would allow governance changes while preserving the authority of voters to make local decisions. Id.

2

¶ 3.     In 2015, the Legislature passed Act 46.  See 2015, No. 46.  In support of the Act, the Legislature found that: (1) Vermont's K-12 student population had declined from 103,000 in 1997 to 78,300 in 2015; (2) "[t]he number of school-related personnel had not decreased in proportion to the decline in student population"; (3) during that same period, increased poverty, mental health needs, and drug addiction required the "public schools to fulfill an array of human services functions"; (4) given the thirteen different types of school district governance structures in the state, "elementary and secondary education in Vermont lack[ed] cohesive governance and delivery systems"; (5) as a result, many school districts in Vermont were "not well-suited to achieve economies of scale" and lacked "the flexibility to manage, share, and transfer resources"; (6) a 1999 law enacted to protect small school districts from large tax increases due to declining student populations had "inflated the equalized pupil count in some districts by as much as 77 percent, resulting in artificially low tax rates in those communities"; (7) national literature indicated that the optimal student population for student learning is 300-500 for elementary schools and 600-900 for high schools; (8) national literature indicated "that the optimal size for a school district in terms of financial efficiencies is between 2,000 and 4,000 students"; (9) seventy-nine Vermont school districts had an average daily student population of one hundred or less; (10) the intent of the Act was not to close small schools, "but rather to ensure that those schools have the opportunity to enjoy the expanded educational opportunities and economies of scale that are available to schools within larger, more flexible governance models"; and (11) having "multiple public schools within a single district not only supports flexibility in the management and sharing of resources, but it promotes innovation," such as developing "a specialized focus, which, in turn, increases opportunities for students to choose the school best suited to their needs and interests." Id. § 1.

¶ 4.    In light of these findings, the Legislature stated that, by enacting Act 46, it intended "to move the State toward sustainable models of education governance." Id. § 2.  It further stated that Act 46 was designed to encourage local decisions and actions that: (1) "provide substantial equity in the quality and variety of educational opportunities statewide"; (2) help students to achieve or exceed state education quality standards; (3) "maximize operational efficiencies through increased flexibility to manage, share, and transfer resources, with a goal of increasing the district-level ratio of students to full-time equivalent staff"; (4) "promote transparency and accountability"; and (5) "are delivered at a cost that parents, voters, and taxpayers value."  Id.

¶ 5.    We now turn to the relevant substantive sections of Act 46.  Under § 5, by July 2019, the State was to "provide educational opportunities through sustainable governance structures designed to meet the goals set forth in Sec. 2 of this act pursuant to one of the models described in this section."  Id. § 5(a).  The section then defines what is a "[p]referred structure" and indicates when an "[a]lternative structure"—defined as "a supervisory union with member districts"—may meet the State's goals.  Id. § 5(b)-(c).  The preferred educational governance structure is a school district that: "(1) is responsible for the education of all resident prekindergarten through grade 12 students; (2) is its own supervisory district; (3) has a minimum average daily membership [defined, in relevant part, by § 4001(1) of Title 16 as full-time equivalent enrollment of students who are legal residents of the district] of 900; and (4) is organized and operates according to one of the [following] four most common governance structures": operates the schools for all resident pre-K-12 students; operates schools for all resident pre-K-8 students and pays tuition for all resident 9-12 students; operates schools for all resident pre-K-6 students and pays tuition for all resident 7-12 students; or operates no schools and pays tuition for all pre-K-12 students.  Id. § 5(b).

¶ 6.    Where the preferred structure is not "possible or not the best model to achieve Vermont's education goals in all regions of the State," an alternative structure—"a supervisory

4

union composed of multiple member districts, each with its separate school board"—"can meet the State's goals, particularly if" (1) the member districts are collectively responsible for educating all resident pre-K-12 students; (2) "the supervisory union operates in a manner that maximizes efficiencies through economies of scale and the flexible . . . sharing of nonfinancial resources among the member districts"; (3) "the supervisory union has the smallest number of member school districts practicable . . ."; and (4) "the combined average daily membership of all member districts is not less than 1,100." Id. § 5(c).

¶ 7.     Section 6(a) of Act 46 sets forth the conditions that a newly formed district had to meet on or before July 1, 2017, to receive the enhanced tax incentives in § 6(b). Section 7(a) sets forth the conditions that a newly formed district had to satisfy on or before July 1, 2019, to receive the tax incentives in § 7(b). Section 8 concerns the Board of Education's evaluation of proposals, including those submitted under §§ 6-7, to create a newly formed union school district, to determine if the proposal is designed to create a sustainable governance structure that meets the goals set forth in § 2. Under § 8(b), the Board may approve a supervisory union that is an alternative structure only if the proposal (1) is the "best means" of meeting the § 2 goals in that "particular region," and (2) "ensures transparency and accountability," including "in relation to the supervisory union budget, which may include a process by which the electorate votes directly whether to approve the proposed supervisory union budget."

¶ 8.     Section 9 requires a district school board that has a governance structure different from the preferred structure identified in § 5(b) or that did not expect to have such a structure in place before July 1, 2019, to take the following actions on or before November 30, 2017: (1) evaluate its current ability to meet or exceed the § 2 goals; (2) meet with the boards of one or more other districts to discuss ways to promote the § 2 goals throughout the region; and (3) submit a proposal on behalf of itself or jointly with other boards both indicating whether it intends to

retain its current governance structure or form a different governance structure and demonstrating that its chosen governance structure meets or exceeds § 2 goals.

¶ 9. In order to provide educational opportunities through sustainable governance structures set forth in § 5(b), § 10(a) requires the Secretary of Education (1) to review the governance structures of the school districts and supervisory unions as they would exist on July 1, 2019, and consider any § 9 proposals; and (2) develop on or before June 1, 2018, "and present to the State Board of Education a proposed plan that, to the extent necessary to promote the purpose stated [therein] would move districts into the more sustainable, preferred model of governance set forth in Sec. 5(b)." That subsection further provides, in relevant part, that if it is "not possible or practicable" to realign some districts, "where necessary," into a preferred structure, "then the proposal may also include alternative governance structures as necessary" as long as the proposed alternative governance structure is designed to promote the purpose stated therein. Id. § 10(a)(2). Under § 10(b), on or before November 30, 2018, the Board was required to review and analyze the Secretary's plan and, after taking any testimony or asking for any additional information, approve the proposed plan in its original or an amended form and publish "its order merging and realigning districts and supervisory unions where necessary." Section 10 is not applicable to districts that began to operate as a unified union school district between June 2013 and July 2019 and that either voluntarily merged into a preferred education governance structure as identified in § 5(b) or were eligible to receive incentives under Act 153 or Act 156. Id. § 10(c).

¶ 10. In sum, Act 46 established a multi-year, two-phased process to provide school districts multiple opportunities "to unify existing governance units into more 'sustainable governance structures.'" 2017, No. 49, § 1(a) (making findings regarding Act 46 and noting that Legislature intended these governance changes to revitalize small schools by promoting "equity in their offerings and stability in their finances"). The first phase built upon existing incentives in prior laws for school districts to merge voluntarily into preferred governance structures as defined

6

therein. 2015, No. 46, §§ 6-7. The second phase—the subject of plaintiffs' claims—established the process for districts that had not, and elected not to, voluntarily merge into preferred governance structures by specified dates. Id. §§ 9-10. Both phases are guided by the goals set forth in § 2 of Act 46 and the preferred and alternative governance structures defined in § 5. The second phase is also guided by § 9, which requires every nonpreferred structure to self-evaluate and to submit a proposed future alternative structure, as well as § 10, which describes the process culminating in the Board's final merger order.

¶ 11. In 2017, in response to some districts resisting merger or experiencing difficulties satisfying Act 46's requirements, the Legislature passed Act 49, which provided more flexibility in adopting alternative governance structures by offering additional incentives and exemptions if newly created districts received voter approval on or before November 30, 2017. 2017, No. 49, §§ 2-4. Act 49 also directed the Board to adopt rules concerning the submission of § 9 proposals, which the Board promulgated as Rule Series 3400. Id. § 20 (allowing Board to "adopt rules designed to assist districts in submitting alternative structure proposals," but prohibiting Board from imposing "more stringent requirements than those in the act"); see also Series 3400: Proposals for Alternative Structures Under Act 46, Code of Vt. Rules 22 000 037 [hereinafter Rule 3400], https://education.vermont.gov/sites/aoe/files/documents/edu-state-board-rules-series-3400.pdf [https://perma.cc/ZM42-XQF9].

¶ 12. In Act 49, the Legislature found that 105 Vermont towns had "voted to merge 113 school districts into slightly larger, more sustainable governance structures," thereby creating twenty-three new unified school districts and resulting in approximately sixty percent of Vermont children living in school districts satisfying Act 46's goals. Id. § 1(c). While lauding the fact that these larger, more flexible union districts had "begun to realize distinct benefits"—including the ability to offer choice among elementary schools within a district, greater flexibility in sharing staff and resources, the elimination of bureaucratic redundancies, and flexibility to create magnet

7

schools offering a particular area of specialization—the Legislature expressed concern that, due to complications ranging from geographic isolation to differing operational models or levels of debt, significant areas of the state had experienced difficulty satisfying Act 46's goals. Id. § 1(d)-(e). The Legislature forewarned, however, that nothing in Act 49 "should be interpreted to suggest that it is acceptable for a school district to fail to take reasonable and robust action to seek to meet the goals of Act 46." Id. § 1(f). The Legislature pronounced that Act 49 was "designed to make useful changes to the merger time lines and allowable governance structures under Act 46 without weakening or eliminating the Act's fundamental phased merger and incentive structures and requirements." Id.

## II. The Administrative and Judicial Proceedings

¶ 13. In June 2018, following the deadline for § 9 proposals by school districts that had not merged—and were not planning to merge—into preferred governance structures by the statutory deadlines, the Secretary submitted to the Board a 189-page proposed statewide plan for the merger of school districts. The proposed plan addressed in detail the forty-three § 9 proposals it had received from districts and groups of districts and included a 201-page analysis of common data points for those districts that had submitted proposals.

¶ 14. Beginning in September 2018, the Board held five public meetings to review the Secretary's proposed plan and provided districts that had submitted § 9 proposals an opportunity to identify any claimed errors in the Secretary's report. In November 2018, the Board issued its Final Report of Decisions and Order, in which it merged forty-two districts located in thirty-six towns to form eleven new union school districts, enlarged an existing union school district by two new members, merged one elementary school district into a modified unified union school district, conditionally required an additional four such transitions, and declined to alter the governance structures of forty-seven districts. The final order was accompanied by default articles of agreement that applied to newly created districts. See 2017, No. 49, § 8 (amending § 10 of Act 46

8

and requiring statewide plan to include articles of agreement "to be used by all new unified union school districts created under the plan unless and until new or amended articles are approved").

¶ 15.   In January 2019, plaintiffs filed a lawsuit in the civil division, pursuant to Vermont Rule of Civil Procedure 75,[3] challenging the Board's implementation of Act 46, as amended by Act 49.  In their seventy-page amended complaint that included multiple counts, plaintiffs asked the court to vacate all or part of the Board's final order.  After considering the public interest and potential harm to the parties and evaluating the likelihood of plaintiffs succeeding on their claims, the civil division denied plaintiffs' motion for a preliminary injunction in a March 2019 decision. The following month, in response to defendants' motion, the court dismissed plaintiffs' counts alleging due-process violations and an unconstitutional delegation of legislative powers to the Board; however, the court concluded that material facts had not been established with respect to plaintiffs' other counts.  In a June 2019 decision addressing the parties' cross-motions for summary judgment, the civil division granted summary judgment to defendants on plaintiffs' remaining counts.[4]

### III.  Plaintiffs' Appeal

¶ 16.   On appeal to this Court, plaintiffs argue that: (1) the Secretary and the Board failed to implement the plain language of Act 46; (2) the Board's final order is based on a flawed interpretation of Act 46 that violates provisions of Vermont statutory law and the Vermont Constitution; and (3) the order contravenes this Court's decision in Brigham v. State, 166 Vt. 246, 692 A.2d 384 (1997) (per curiam), construing the Vermont Constitution's Common Benefits Clause.

---

[3] Rule 75 allows review of a state agency's or subdivision's actions or failure to act not reviewable under Vermont Rule of Civil Procedure 74.  See V.R.C.P. 75(a).

[4] The court initially denied defendants' motion for summary judgment as to one particular district's specific claim for relief concerning one of the counts; however, all parties later agreed that any remaining claims were moot and that the court could enter a final judgment on all counts.

## A. Standard of Review

¶ 17. There are no material facts in dispute, but the parties disagree about the appropriate standard of review for this Court to apply. In their principal brief, plaintiffs state simply that they are raising purely legal issues for this Court's nondeferential review. See Hallsmith v. City of Montpelier, 2015 VT 83, ¶ 9, 199 Vt. 488, 125 A.3d 882 ("We review questions of law, including whether the requirements of due process have been satisfied, de novo." (quotation omitted)). Defendants contend that this Court should apply a highly deferential standard in reviewing the Board's actions because this is a quasi-legislative process set forth in Act 46 that required the Board to engage in a generalized rather than an individualized implementation of legislative policy. See In re Korrow Real Estate, LLC Act 250 Permit Amendment Application, 2018 VT 39, ¶ 20, 207 Vt. 274, 187 A.3d 1125 ("Even when conducting an evidentiary hearing, the court owes deference to agency interpretations of policy or terms when: (1) that agency is statutorily authorized to provide such guidance; (2) complex methodologies are applied; or (3) such decisions are within the agency's area of expertise." (quotation omitted)); see also In re Williston Inn Grp., 2008 VT 47, ¶ 12, 183 Vt. 621, 949 A.2d 1073 (mem.) ("We have long extended this principle of deference to agency interpretations of statutes which the Legislature has entrusted to their administration."). Plaintiffs respond that no deference is owed to the Board because its expertise lies in education policy rather than merging or dissolving municipal entities.

¶ 18. Plaintiffs' primary claims of error in this appeal are that the Board's interpretation of the enabling statute exceeded the legislative delegation set forth therein and that, if it did not, the delegation constituted an unconstitutional delegation of legislative authority. Regarding the Board's implementation of Acts 46 and 49, this Court has "long extended [the] principle of deference to agency interpretations of statutes which the Legislature has entrusted to their administration." Williston Inn Grp., 2008 VT 47, ¶¶ 12-13 (noting that this principle arises out of separation-of-powers concerns in addition to consideration of agency expertise); accord C&S

10

Wholesale Grocers, Inc. v. Dep't of Taxes, 2016 VT 77A, ¶ 10, 203 Vt. 183, 155 A.3d 169; see Gasoline Marketers of Vt., Inc. v. Agency of Nat. Res., 169 Vt. 504, 508, 739 A.2d 1230, 1233 (1999) ("[A]bsent a clear and convincing showing to the contrary, decisions made within the expertise of administrative agencies are presumed to be correct, valid, and reasonable . . . ."). Accordingly, to the extent the language of the enabling statute is ambiguous or subject to multiple reasonable interpretations, we will not substitute our judgment for the Board's reasonable interpretation of its authority pursuant to that statutory language.

¶ 19. We recognize, of course, that our ultimate goal in interpreting a statute "is to effectuate the Legislature's intent." Negotiations Comm. of Caledonia Cent. Supervisory Union v. Caledonia Cent. Educ. Ass'n, 2018 VT 18, ¶ 14, 206 Vt. 636, 184 A.3d 236. If the statutory language is clear, we will enforce the statute according to the plain meaning of its terms. Id. If the statutory language is not clear, "we seek to determine legislative intent by considering the entire statute, including its subject matter, effects and consequences, as well as the reason and spirit of the law." Id. (quotation and alteration omitted). "Provisions that are part of the same statutory scheme must be read in context and the entire statutory scheme read together to ascertain legislative intention from the whole of the enactments." Id. (quotation omitted).

¶ 20. In this case, our analysis of plaintiffs' challenge to the Agency's and Board's implementation of the statute does not rest upon deference to the Agency or Board because, as we explain below, the statute plainly does not require the necessity finding for which plaintiffs advocate. With respect to plaintiffs' constitutional challenges, we give no deference when "reviewing a constitutional challenge to the application of a statute." State v. Roya, 167 Vt. 594, 595, 708 A.2d 908, 909 (1998) (mem.).

B. Statutory Challenges

¶ 21. In this section, we address plaintiffs' arguments that: (1) the enabling statute requires a threshold finding of necessity that the Board did not make; (2) the Board failed to

11

discharge its responsibility to conduct a fair review of § 9 proposals; (3) because Act 46 includes a provision specifically calling for forced mergers through 16 V.S.A. § 165, § 10 cannot be understood to require forced mergers when it never expressly provides for such; and (4) Act 46 does not expressly override or repeal other sections of Title 16 calling for districts to vote before assuming another district's debt.

¶ 22.    Plaintiffs first argue that the Agency and the Board erroneously interpreted Act 46 as establishing a two-phase process that incentivizes voluntary mergers in phase one and then, for those districts that did not merge, forces involuntary mergers into preferred structures whenever possible or practicable, without determining if the forced mergers are "necessary."  In making this argument, plaintiffs focus on § 10(a)-(b) of Act 46.  In plaintiffs' view, § 10(a)(2) permits the Secretary to propose involuntary mergers in its statewide plan, but §10(b) allows the Board's final order to call for involuntary mergers only when possible, practicable, and necessary.  According to plaintiffs, both the Secretary and the Board called for involuntary mergers whenever possible and practicable, without analyzing whether the mergers were necessary.  In particular, plaintiffs cite to the Board's statement in its overview of its final order that it had "chosen to hew as closely to the intent of the Act as that authority will allow, creating preferred structures wherever possible, and in all other cases, creating sustainable governance structures with the fewest number of districts possible and practicable."  Plaintiffs also argue that the Secretary and the Board disregarded their statutory duty to review § 9 proposals and give districts an opportunity to amend those proposals, thereby effectively repealing that section.  Specifically, plaintiffs point to the Agency's comment with respect to one particular § 9 proposal that the proposal was not strong enough to overcome the Legislature's stated preference for larger governance structures.

¶ 23.    Plaintiffs' arguments are inconsistent with the legislative intent underlying Acts 46 and 49 and cannot be reconciled with the various sections in those acts considered together.  As noted, the Legislature enacted Act 46 after its attempts in previous laws to incentivize only

voluntary mergers failed to significantly reduce the number of districts by merging them into larger, more sustainable, preferred governance structures. The Legislature documented in the Act's legislative findings the negative statewide impact on K-12 education resulting from schools not being in sustainable governance structures. It determined that merging districts into sustainable governance structures was necessary to achieve the goals stated, including economies of scale and greater educational opportunities. Essentially, Act 46 established the presumption that preferred structures are the best means of satisfying the Act's goals, and it placed on those districts objecting to merger into possible and practicable preferred structures the burden of establishing that their proposed alternative structures provided a superior means of meeting those goals. In short, where merger into a preferred governance structure was possible and practicable, the Legislature presumed that merger was the best means of achieving Act 46's goals, unless shown otherwise.

¶ 24. An examination of the interplay among Act 46's provisions supports this construction of Act 46 and demonstrates that the Legislature did not create a "necessity" threshold for the Board to force mergers. Section 5 provides that "the State shall provide educational opportunities through sustainable governance structures designed to meet" the § 2 goals "pursuant to" either a preferred structure as described therein, or an alternative structure where a preferred structure "may not be possible or the best model to achieve Vermont's education goals in all regions of the State." 2015, Act 46, § 5(a)-(c) (emphasis added). The Board may approve an alternative structure creating, expanding, or continuing a supervisory union "only if the Board concludes that this alternative structure," in part, "is the best means of meeting" the § 2 goals "in a particular region." Id. § 8(b) (emphasis added). Section 10(a) of Act 46 requires the Agency to review the governance structures across the state, including any § 9 proposals, and to develop a statewide plan "that, to the extent necessary" to provide educational opportunities through sustainable governance structures "would move districts into the more sustainable, preferred

13

model of governance set forth in Sec. 5(b)." Id. § 10(a). Where "it is not possible or practicable" to meet "all aspects of Sec. 5(b), then the proposal may also include alternative governance structures as necessary," provided that, in part, the proposed alternative structure is designed to "provide educational opportunities through sustainable governance structures . . . pursuant to one of the models described in Sec. 5." Id. The Board "shall approve" the Agency's proposal that adheres to § 10(a) and "shall publish . . . its order merging and realigning districts and supervisory unions where necessary." Id. § 10(b).

¶ 25. Plaintiffs' attempt to convert the last two words of § 10(b) into a mandate preventing the Board from merging school districts into sustainable governance structures, without local approval, absent a finding of necessity, is inconsistent with these provisions when read together. The term "where necessary" in § 10(b) means nothing more than requiring the Board to merge and realign districts according to the mandates of Act 46, which presumes the necessity of merging districts into preferred or alternative governance structures to achieve its stated goals. More specifically, viewed in the context of the relevant provisions, those two words indicate only that the Board was required to take action by merging schools into either a preferred governance structure or, if an objecting district established that the preferred structure is not the best means of promoting § 2 goals in that region, an alternative structure that meets specific criteria. There is no mandatory threshold necessity finding separate from Act 46's directive that the Board take all feasible actions, whenever possible and practicable, to merge schools into preferred or alternative governance structures within each region.

¶ 26. In Act 46, the Legislature intended to require the establishment of preferred or approved alternative governance structures to achieve its stated goals, even if that meant forcing involuntary mergers. Considered in this context, the word "necessary" in § 10(b) reflects the Legislature's recognition that the Board will have to take certain merger actions to achieve Act 46's goals. As with plaintiffs, the dissent's focus on the term "where necessary" in § 10 essentially

eliminates the presumption in § 5 that preferred structures further the statute's goals and that alternative structures are permitted only when certain requirements are met, which was not the case here.

¶ 27. Plaintiffs' suggestion that § 9 proposals were not properly considered is without merit. The Secretary's proposed plan included several hundred pages of appendices discussing the § 9 proposals. Moreover, the Board gave every district that submitted an alternative proposal the opportunity to identify any errors that the Secretary made, to discuss any alternative proposal with the Board, or to amend any such proposal. In the end, the Board merged forty-two districts located in thirty-six towns to form eleven new union school districts, but it left forty-seven districts with their current governance structures.

¶ 28. We also reject plaintiffs' assertion that § 40 of Act 46, which amended 16 V.S.A. § 165(b), provided the exclusive means of forcing involuntary mergers of school districts. Subsection 165(b) requires the Secretary to determine every two years whether students in each public school are being provided substantially equal educational opportunities with respect to other public schools. If within the next two-year period a school fails to meet statutory performance standards following the Secretary's recommended actions and technical assistance, the Secretary must recommend to the Board one or more of the actions specified therein. Among other things, § 40 of Act 46 added as one of those specified actions that "the State Board require two or more school districts to consolidate their governance structures." 16 V.S.A. § 165(b)(5). According to plaintiffs, the fact that the Board used the word "require" in this context, but not in § 10(b), and that 16 V.S.A. § 165(c) affords affected school districts the opportunity for a hearing before the Board can force merger under § 165(b)(5), demonstrates that this is the only context in which the Legislature intended the Board to force mergers.

¶ 29. This argument is untenable because these laws address distinct matters. As discussed above, the second phase of Act 46, at the heart of which is § 10, required the Board to

15

adopt a regionally focused statewide plan by November 2018 pursuant to the policy goals stated in the Act. Under that phase of the Act, alternative structures for individual districts are permitted only if they are found to be the best means of meeting those goals in a particular region. In contrast, § 40 of Act 46, which is not set to take effect until July 2020, addresses the specific situation when the Secretary determines that an individual school is not meeting statutory performance standards. There is nothing illogical, as plaintiffs suggest, about addressing the failure of a specific school to meet performance standards differently than the process for altering statewide education governance structures on a regional basis to better meet explicitly stated legislative goals.

¶ 30. For similar reasons, we do not find persuasive any of plaintiffs' arguments suggesting that the Board's implementation of Act 46 conflicted with other sections of Title 16. In construing statutes to give effect to legislative intent, we seek "to harmonize statutes and not find conflict if possible." Gallipo v. City of Rutland, 173 Vt. 223, 235, 789 A.2d 942, 951 (2001). If that is not possible, specific and more recent statutes regarding the same subject matter control over more general and older statutes. State of Vt. Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 40, __ Vt. __, 210 A.3d 445; State v. Lynch, 137 Vt. 607, 610, 409 A.2d 1001, 1003 (1979).

¶ 31. Plaintiffs argue that specific provisions of Chapter 11 of Title 16 unambiguously require reciprocal votes from each involved district before any merger of districts or transfer of the districts' debts and assets. According to plaintiffs, the Legislature intended Acts 46 and 49 to encourage more-consolidated school districts but to leave intact the voting rights of individual communities on whether to merge their school districts with neighboring ones. Essentially, plaintiffs are arguing that Acts 46 and 49 did not in fact provide for involuntary mergers but rather anticipated giving individual communities a veto power over proposed mergers, pursuant to provisions in Chapter 11 of Title 16. For the reasons discussed above, we find this interpretation contrary to the plain language and spirit of Acts 46 and 49.

16

¶ 32. In support of their argument, plaintiffs point to 16 V.S.A. §§ 706d, 706f and 721, provisions which are part of a statutory procedure that has remained largely unchanged since first enacted over forty years ago. 1967, No. 277 (Adj. Sess.), §§ 10, 12, 35. In contrast to the involuntary mergers of districts to form supervisory districts contemplated by the second phase of Act 46, §§ 706d and 706f concern the voluntary formation of a union school district by vote after a local study committee recommends merging multiple districts. Section 706 provides that the boards of two or more school districts can form a study committee to evaluate whether to form a single union district. If the Board approves a committee report recommending merger, see 16 V.S.A. §§ 706b, 706c, then each school district designated "as necessary to the proposed union school district shall vote, and any school district designated . . . as advisable to be included may vote on the establishment of the proposed union school district." 16 V.S.A. § 706d. Section 706f specifies the contents of a warning on the vote to establish the union. Section 721 concerns the process for the inclusion of additional school districts into an existing union district with the Board's approval when initiated either by a district outside the union or by the union district itself.

¶ 33. Section 721 neither addresses nor prohibits involuntary mergers, as contemplated by Act 46. Further, the fact that some longstanding provisions in Title 16 require local approval for mergers under certain circumstances does not demonstrate they are applicable under Acts 46 and 49 or that local approval is a necessary element of legislatively authorized mergers. See Opinion of the Justices, 246 A.2d 90, 93 (Del. 1968) ("The fact that, heretofore, no consolidating of districts or imposition of taxes could be made without an affirmative vote of the residents of the particular district, does not mean that ever thereafter the General Assembly is bound to preserve that practice.").

¶ 34. In short, none of the provisions that plaintiffs rely on are applicable in situations involving involuntary state-initiated mergers into preferred governance structures pursuant to the second phase of Act 46. See 2015, No. 46, § 5(b) (defining preferred governance structure that is,

17

among other things, "its own supervisory district"); id. § 8(b) (providing that "Board "shall approve the creation, expansion, or continuation of a supervisory union only if the Board concludes that the alternative structure . . . is the best means of meeting the [§ 2] goals . . . in a particular region"). Notwithstanding the constraints of the Chapter 11 provisions applicable in different circumstances, § 10(b) of Act 46 authorizes the Board to issue an order merging existing school districts consistent with the goals of the Act, even in situations where one or more of the included districts objects to the merger. Plaintiffs have not demonstrated that the Board failed to apply any Title 16 provisions in circumstances in which they were applicable.

¶ 35. Nor have plaintiffs demonstrated that the Board misinterpreted the provisions set forth in Act 46, as amended by Act 49, or exceeded its authority in implementing those laws. The Board's interpretation of those Acts is entirely reasonable and supported by the plain language of the provisions contained therein, as well as the underlying purposes and spirit of those laws. To the extent that any of the provisions in those Acts may be considered ambiguous with respect to the Agency's or Board's delegated authority, we conclude that the Board reasonably interpreted those provisions in implementing the Acts.[5]

---

[5] Plaintiffs are essentially asking this Court to rewrite Act 46 in a way in which the Legislature declined to do when urged to do so. In 2016, the Board proposed rules recognizing that alternative structures are permissible when preferred structures are not "possible or the best model." Rules 3430.2, 3430.2.1. Rule 3430.2.1 recognizes that alternative structures can meet § 2 goals " 'particularly if' " they have " 'the smallest number of member school districts practicable,' " which means that, to the extent current governance structures allow, districts merge even within proposed alternative structures. Rule 3430.2.1 (quoting 2015, No. 46, § 5(c)); Rule 3430.2.2. Rule 3450.3 explains that a proposed alternative structure should demonstrate it is the best means of meeting § 2 goals in a particular region, as required by § 8(b). In 2017, opponents of the second-phase involuntary-merger process sought to eliminate references in Act 46 to preferred structures and the requirement that the Board find that a proposed alternative structure is the best means of meeting Act 46 goals for that region. See H.15, 2017-2018 Gen. Assem., Bien. Sess. (Vt. 2017) (proposing this in statement of purpose); S.15, 2017-2018 Gen. Assem., Bien. Sess. (Vt. 2017) (same). Opponents sought to make the criteria for the two types of structures identical and to weaken the requirement that alternative structures have the smallest number of member districts practicable. H.15 (proposing this in statement of purpose), § 1 (proposing amendment to § 5(c)(3)); S.15 (proposing this in statement of purpose), § 1 (proposing amendment to § 5(c)(3)). Instead, the Legislature passed Act 49, which did none of those things. Nor did the

## C. Constitutional Challenges

¶ 36. In this section, we consider plaintiffs' arguments invoking the unlawful-delegation doctrine and the Vermont Constitution's Education and Common Benefits clauses. Plaintiffs first argue that even if the Agency and the Board in fact acted within the authority delegated to them in Acts 46 and 49, then that delegation—which plaintiffs characterize as giving those executive entities the "sole discretion" to dissolve and form school districts—violated the separation-of-powers principle established in the Vermont Constitution. Noting that school districts are considered municipalities in Vermont, plaintiffs assert that the Legislature has the exclusive prerogative under the Vermont Constitution to dissolve and create school districts. They contend that the delegation in this case violates the Constitution and this Court's precedent by giving the Board the authority to: (1) create new school districts and decide what territory—composed of existing smaller school districts—will be included within their limits; and (2) create articles of agreement by which the Board established the size, composition, and powers of the new districts' governing boards. As explained below, we conclude that the Legislature provided in Acts 46 and 49 more than sufficient guidance to the Agency and Board to avoid an unconstitutional delegation of its legislative power concerning the creation, dissolution, and reorganization of school districts in the state.

¶ 37. In responding to plaintiffs' unlawful-delegation argument, we first examine some basic principles. To avoid an unconstitutional reach of the judiciary's own powers as a co-equal branch of government, this Court "presume[s] a statute is constitutional absent clear and irrefragable evidence to the contrary." State v. Curley-Egan, 2006 VT 95, ¶ 27, 180 Vt. 305, 910

Legislature make changes sought by plaintiffs in 2018 or 2019, after the Board issued its final order. We decline plaintiffs' invitation to construe Act 46 in a manner unsupported by the interplay of its provisions and not adopted by the Legislature.

A.2d 200 (quotation omitted) (concluding that Legislature did not unconstitutionally delegate its police power in giving University of Vermont police statewide jurisdiction).

¶ 38.     The Vermont Constitution pronounces that "[t]he Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others." See Vt. Const. ch. II, § 5.  Recognizing that there inevitably "must be a certain amount of overlapping" of the separate branches' powers and that "we must construe the constitutional command consistent with efficient and effective governmental structures that are able to respond to the complex challenges and problems faced by today's state government," we have referred to "our separation-of-powers requirement as a relatively forgiving standard, tolerant of such overlapping institutional arrangements short of one branch virtually usurping from another its constitutionally defined function." Hunter v. State, 2004 VT 108, ¶ 21, 177 Vt. 339, 865 A.2d 381 (quotations and alterations omitted) (quoting James Madison for principle that separation-of-powers doctrine is violated when one branch exercises another branch's power in manner that usurps other branch's constitutionally defined function); see also Carolina-Virginia Coastal Highway v. Coastal Turnpike Auth., 74 S.E.2d 310, 316 (N.C. 1953) (noting that, without delegation authority, "the Legislature would often be placed in the awkward situation of possessing a power over a given subject without being able to exercise it").  Thus, "there can be no claim of unconstitutional delegation of legislative power where a statute establishes reasonable standards to govern the achievement of its purpose and the execution of the power which it confers." In re B & M Realty, LLC, 2016 VT 114, ¶ 28, 203 Vt. 438, 158 A.3d 754 (quotations and alteration omitted); see also Rogers v. Watson, 156 Vt. 483, 493, 594 A.2d 409, 415 (1991) (recognizing that delegation of discretionary authority is valid as long as Legislature provides "sufficient standard or policy to guide" agency's action); Vt. Home Mortg. Credit Agency v. Montpelier Nat'l Bank, 128 Vt. 272, 278, 262 A.2d 445, 449-50 (1970) (recognizing that Legislature "may confide

20

a broad grant of authority to a subordinate agency in intricate matters affecting the general welfare in natural resources, health, education and economics").

¶ 39. The oft-stated distinction with respect to the unlawful-delegation doctrine is "between 'a delegation of the power to make the law which necessarily includes a discretion as to what it shall be and the conferring authority or discretion as to its execution.' " Hunter, 2004 VT 108, ¶ 27 (quoting Vill. of Waterbury v. Melendy, 109 Vt. 441, 451, 199 A. 236, 241 (1938)).[6] "The first cannot be done; to the latter no valid objection can be made." Marshall Field & Co. v. Clark, 143 U.S. 649, 694 (1892) (quotation omitted). "The discretion conferred can be 'wide . . . in the manner and method for the execution of statutes validly adopted.' " Hunter, 2004 VT 108, ¶ 27 (quoting Vt. Educ. Bldgs. Fin. Agency v. Mann, 127 Vt. 262, 267, 247 A.2d 68, 72 (1968)). The U.S. Supreme Court has recognized that as long as a legislative body "provides an administrative agency with standards guiding its actions such that a court could ascertain whether the will of [that body] had been obeyed, no delegation of legislative authority trenching on the principle of separation of powers has occurred." Skinner v. Mid-America Pipeline Co., 490 U.S. 212, 218 (1989) (quotations omitted); see Whitman v. Am. Trucking Ass'n, 531 U.S. 457, 472 (2001) (noting its repeated admonition that legislative body "must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform" (quotation and alteration omitted)).

---

[6] Plaintiffs suggest that Melendy approves as constitutional only delegations of legislative authority to local entities to deal with matters of local concern. That is not accurate. Although this Court stated in Melendy that such delegations were an exception to the unlawful-delegation doctrine, 109 Vt. at 448, 199 A. at 239, it did not suggest that that was the only type of lawful delegation. In fact, we found the delegation in that case unconstitutional because the act in question provided no "policy or plan for apportionment of the expense of flood control projects as between the state and the municipalities sought to be assessed," and provided no guidance whatsoever to the Public Service Commission to determine how the benefits and assessments from the act were to be distributed. Id. at 453, 199 A. at 242.

¶ 40. Accordingly, the legislative body "may not only give such authorizations to determine specific facts, but may establish primary standards, devolving upon others the duty to carry out the declared legislative policy." Melendy, 109 Vt. at 451, 199 A. at 241; see also Cty. Bd. of Educ. v. Goodpaster, 84 S.W.2d 55, 58 (Ky. 1935) (stating that unconstitutional delegation of legislative power "means delegation of discretion as to what the law shall be, and does not mean that the Legislature may not confer discretion in the administration of the law itself"); Carolina-Virginia Coastal Highway, 74 S.E.2d at 316 (stating that "the legislative body must declare the policy of the law, fix legal principles which are to control in given cases, and provide adequate standards for the guidance of the administrative body or officer empowered to execute the law," and it "may delegate the power to find facts or determine the existence or nonexistence of a factual situation or condition on which the operation of a law is made to depend, or another agency of the government is to come into existence," but "it cannot vest in a subordinate agency the power to apply or withhold the application of the law in its absolute or unguided discretion"). As this Court explained long ago:

> Since legislation must often be adapted to complex conditions involving a host of details, with which the lawmaking body cannot deal directly, the Legislature may, without abdication of its essential functions, lay down policies and establish standards while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the legislature is to apply.

State v. Auclair, 110 Vt. 147, 163, 4 A.2d 107, 114 (1939) (quotation omitted) (stating that Legislature may vest agency with "wide discretion" as long as discretion is not "unrestrained and arbitrary" in furtherance of fixed legislative policy).

¶ 41. Specifically, with respect to the delegation of legislative authority over the creation, merger, or dissolution of school districts, courts overwhelmingly agree that such delegation, especially when accompanied by extensive guidance such as in the instant case, does not violate the separation-of-powers principle. See Annotation, Discretion of Administrative Officers as to

Changing Boundaries of School District, 135 A.L.R. 1096, § 2 (originally published in 1941 and supplementing 65 A.L.R. 1523) (listing cases supporting proposition that state legislatures have "almost unlimited power to abolish, divide, or alter" school districts and that "this broad discretionary power to change the boundaries of school districts may be delegated by the legislature to administrative bodies, to be exercised under certain conditions"); 16B McQuillan, The Law of Municipal Corporations § 46:2 (3d. ed. 2019) (stating that legislative authority to establish school districts and enact laws for their governance "is frequently delegated to some extent" to other entities, including boards of education, and that legislature "has the power to provide in any way that it chooses for the administration and management of public school affairs in any district" in state "independent of local government" interest); see also Inhabitants of N. Berwick v. State Bd. of Educ., 227 A.2d 462, 468 (Me. 1967) (stating that Legislature has power "to divide or join towns into school districts as it pleases" by law "without referendum to the people in the municipalities within the proposed district" and that it may "delegate such power to some administrative body").

¶ 42.    Legislative action to "create and abolish school districts and change the boundaries thereof . . . is usually provided for by general laws in which the Legislature formulated the policy broadly, leaving the working out of the details to designated officers." Berthot v. Gallatin Cty. High Sch. Dist., 58 P.2d 264, 266 (Mont. 1936). Such laws "do not violate the provision against delegating legislative power to administrative officers." Id.; see also Schaefer v. Tea Area Sch. Dist. 41-5, 2015 S.D. 87, ¶ 8, 871 N.W.2d 838 (stating that "creation, enlargement, consolidation, alteration and dissolution of school districts is a legislative function" that legislature may delegate to boards of education (quotation and alterations omitted)); Edgewood Indep. Sch. Dist. v. Meno, 917 S.W.2d 717, 740 (Tex. 1995) (rejecting argument that bill giving commissioner of education extensive power to create rules and consolidate school districts was unconstitutional delegation of legislative power, and noting that legislature "may delegate its powers to agencies established to

23

carry out legislative purposes, as long as it establishes reasonable standards to guide the entity to which the powers are delegated" (quotation omitted)); Sch. Dist. No. 3 v. Callahan, 297 N.W. 407, 411 (Wis. 1941) (stating that "the formation of school districts and the power to exercise discretion in determining whether such districts shall be altered by consolidation or otherwise is not such an exclusive function as may not be delegated to the state superintendent").

¶ 43.    Vermont is no exception to these general principles.  See Town of Barre v. Sch. Dist. No. 13, 67 Vt. 108, 112-13, 30 A. 807, 808 (1894) (stating that "education of its youth is a state work, created, controlled, and enforced by public laws" and thus Legislature "has the right and power to determine when, how, and by whom its work shall be carried on"); see also Pierce v. Whitman, 23 Vt. 626, 628 (1851) (citing eighteenth-century acts empowering towns to divide their territories into school districts).  Moreover, for more than fifty years, the Legislature has delegated to the Board the power to approve or reject certain school district changes.  See Appelget v. Baird, 126 Vt. 503, 504, 236 A.2d 671, 672 (1967) (relying on statute giving Board authority to determine whether proposed union school district was in state's best interests).

¶ 44.    In this case, Acts 46 and 49 provide more than sufficient guidance to satisfy the lawful-delegation standard examined above.  See B & M Realty, LLC, 2016 VT 114, ¶ 28 (finding no unlawful delegation of legislative authority in planning and development act that identified legislative purpose for planning generally, listed specific goals that regional plans must meet, identified duties of regional planning commissions and established required elements of regional plans, and specified procedural requirements for adopting plans, including opportunity for public hearing and comment); see also Opinion of the Justices, 246 A.2d at 94 (finding no unlawful delegation of legislative power to state board of education in school district reorganization act that controlled board's discretion by establishing general principles and standards and directing board to adopt criteria according to specified factors); Penn Sch. Dist. No. 7 v. Bd. of Educ. of Lewis-Cass Intermediate Sch. Dist., 165 N.W.2d 464, 471 (Mich. Ct. App. 1968) (rejecting unlawful

24

delegation argument where act declared policy and primary standard for statewide school district reorganization and left it for state committee to develop detailed principles and procedures for implementation of act); Chartiers Valley Joint Sch. v. Cty. Bd. of Sch. Dirs., 211 A.2d 487, 493-95 (Pa. 1965) (concluding that legislative act providing clear policy objectives and procedures to administrators for school district reorganization was not unconstitutional delegation of legislative power, and stating that "rule against delegation of legislative power does not mean that reorganization can be achieved only by statutory specification of actual geographic boundaries for every administrative unit in the state").

¶ 45.    Acts 46 and 49 set forth detailed legislative findings and explicit policy goals. Further, the laws specify preferred and alternative school district governance structures for the Board to approve based on explicit conditions and criteria. Further still, the laws set forth detailed processes and procedures by which the Agency and the Board must consider the state's various proposed school districts, all within the confines of the laws' policies, goals, and criteria. Indeed, it is difficult to imagine more specific guidance for the Board to apply its discretion within the bounds of the authority delegated to it by the Legislature.

¶ 46.    Faced with this sea of case law and legal authority contrary to their unlawful-delegation position, plaintiffs cling to a thin reed—this Court's five-paragraph 1913 advisory opinion in In re Municipal Charters, 86 Vt. 562, 86 A. 307 (1913). In that case, the governor asked this Court to advise him on the constitutionality of a 1910 law allowing villages to be chartered, and village charters to be amended, on petition to the Public Service Commission "without resorting to the General Assembly." Id. at 563, 86 A. at 307. Relying on the constitutional clause giving the Legislature the power "to 'constitute towns, boroughs, cities, and counties,' " id. (quoting Vt. Const. ch. II, § 6), this Court concluded that the 1910 law went too far in delegating "to the Commission to determine the plan and frame of government of the proposed village, what

powers and functions it may exercise, and what shall be the limit of its expenditures and indebtedness." Id. at 564, 86 A. at 308.

¶ 47. Recognizing that Municipal Charters dealt with a specific constitutional clause not at issue here, plaintiffs point out that another clause in the same constitutional provision empowers the Legislature to "grant charters of incorporations, subject to the provisions of section 69," Vt. Const. ch. II, § 6, which in turn permits the grant of charters of incorporation to both "municipal" and "educational" corporations, among others, Vt. Const. ch. II, § 69. Plaintiffs also cite to 1 V.S.A. § 126, which includes within its definition of "Municipality," for the purpose of construing statutes, a "town school district."

¶ 48. For several reasons, Municipal Charters does not control the outcome in this case. As noted, the Court in Municipal Charters considered an act that empowered the Public Service Commission "to determine the plan and frame of government of the proposed village, what powers and functions it may exercise, and what shall be the limit of its expenditures and indebtedness," 86 Vt. at 564, 86 A. at 308, without any direction or standards. The Court acknowledged that one section of the law enumerated the various potential powers and functions of a proposed village, but it noted that the law "still left to the Commission to determine in its discretion what of those powers and functions it will confer in the particular case." Id. That is a far cry from the detailed legislative policy, findings, purposes, goals, procedures, standards, and criteria set forth in Acts 46 and 49.

¶ 49. In any event, as the trial court noted, Municipal Charters concerned the incorporation of municipalities, which the constitutional clause at issue expressly reserved to the Legislature—not the reorganization of school districts. Notwithstanding that school districts are treated as municipalities in some respects, the two have not always been treated the same under the nondelegation doctrine. As noted above, the Vermont Legislature has a long history of permitting the creation or merger of school districts without legislative approval, but it has never

26

done so with respect to the incorporation of municipalities. Moreover, state courts have generally given state legislatures more leeway in delegating legislative power over the creation, dissolution, or consolidation of school districts, as opposed to the incorporation of municipalities. Compare 16B McQuillan, supra, § 46:2 (stating that power to establish school districts is vested in state legislature, but "is frequently delegated to some extent to quasi-corporations," including boards of education), with 1 McQuillan, supra, § 3:10 (stating that state legislatures "cannot delegate to courts or other bodies . . . the power to create municipal corporations," although legislatures may pass general laws for incorporation of municipalities with fixed conditions on which they may be created). For the above reasons, our advisory opinion in Municipal Charters does not control the outcome of this case.

¶ 50. Nor do we find any merit to plaintiffs' suggestion that the legislation authorizing the Board to promulgate default articles of agreement constituted an unlawful delegation of legislative power. The Board has a long history of reviewing articles of agreement. See, e.g., 1967, No. 277 (Adj. Sess.), § 8 (requiring committee proposing union district to "prepare a report in the form of an agreement between member districts," and requiring Board to review committee reports); see also 16 V.S.A. § 706b(b) (requiring committee proposing union to "prepare a report in the form of an agreement between member districts"). In allowing the Board to issue default articles of agreement until amended articles are approved, the Legislature permissibly delegated authority necessary to implement its goal of moving toward sustainable governance structures. Act 49 allowed the Board to issue default articles of agreement because involuntarily created districts would not have proposed articles but would need them to operate. The Act gave "districts subject to merger" ninety days to form a committee to draft proposed amended articles. 2017, No. 49, § 8 (adding § 10(d)(1) to Act 46). We see no unlawful delegation in this process.

¶ 51. Plaintiffs also argue that the Board's implementation of Act 46 violates the Vermont Constitution's Education and Common Benefits clauses. Neither argument withstands

27

scrutiny. In relevant part, the Education Clause provides that "a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth." Vt. Const. ch. II, § 68. Plaintiffs contend that this provision prevents the Legislature from mandating the closure of town schools, which, according to plaintiffs, will be the inevitable result of Act 46. Not only does this argument discount the qualifying clause in § 68, but it ignores the "long and settled" principle in Vermont that education is "a fundamental obligation of state government." Brigham, 166 Vt. at 264, 692 A.2d at 395 (rejecting contention "that the primary constitutional responsibility for education rests with the towns of Vermont"). In any event, Act 46 explicitly states the Legislature's intent to consolidate school districts, not close schools—and, in fact, it did not close any schools. Plaintiffs' concern over potential future school closings is purely speculative and cannot at this juncture be a basis for challenging Act 46 or the Board's implementation of the Act. See Stowe Citizens for Responsible Gov't v. State, 169 Vt. 559, 561, 730 A.2d 573, 576 (1999) (mem.) (declining "to consider invalidating [the Equal Educational Opportunity Act of 1997] based on predictions that future events will demonstrate the statute's failure to fulfill the State's constitutional obligations").

¶ 52. Finally, plaintiffs argue that the Board's final order contravenes Brigham's mandate, pursuant to the Common Benefits Clause, that all students "be afforded a substantially equal opportunity to have access to similar educational revenues." 166 Vt. at 268, 692 A.2d at 397; see Vt. Const. ch. I, art. 7. According to plaintiffs, the Board's unequal distribution of merger incentives and small-school-support grants violates Brigham's central holding that the distribution of educational resources cannot rest upon "the mere fortuity of a child's residence." Id. at 265, 692 A.2d at 396. In plaintiffs' view, Act 46, as implemented by the Board, creates two categories of school districts—those that obtain financial benefits by voluntarily merging and those that will not receive those financial benefits because either their merger proposals were rejected or they refused to voluntarily merge. Plaintiffs assert that distinguishing districts on this basis has no

28

necessary purpose, or even rational basis. Defendants respond that this constitutional claim is not ripe and, in any case, fails because the incentives and grants are rationally related to merging schools into preferred or alternative governance structures that support the Legislature's goal of giving small schools expanded educational opportunities generally only available to larger schools through economies of scale. See Baker v. State, 170 Vt. 194, 203, 206, 744 A.2d 864, 871, 873 (1999) (describing this Court's approach under Common Benefits Clause "as broadly deferential to the legislative prerogative to define and advance governmental ends, while vigorously ensuring that the means chosen bear a just and reasonable relation to the governmental objective" when considered "in light of contemporary conditions").

¶ 53. As with their previous constitutional argument, plaintiffs' hypothetical argument—that students in unspecified school districts at some point in the future might not obtain equal educational opportunities due to unequal levels of funding that could result from not obtaining tax incentives or qualifying for small-school grants—is purely speculative and cannot be the basis for this Court to declare Act 46 unconstitutional under the Common Benefits Clause.[7] No plaintiff has demonstrated that they did not receive a grant previously available to them because of Act 46, let alone that the lack of a grant or other financial incentive resulted in unequal educational opportunities for any particular school or district. Any claim that the Board's multi-factor test for obtaining grants might be applied adversely to an unknown school district for unknown reasons based on data that does not yet exist is not ripe for adjudication. Similarly, any potential tax effects on property owners is speculative and subject to adjustments under other applicable tax laws. And finally, it is not at all clear that the remedy for any common-benefits (or proportional-contribution)

---

[7] In reality, this may actually be a proportional-contribution-clause claim, insofar as it turns on claimed disparate tax burdens, rather than a common-benefits-clause claim. Given our analysis above, we need not resolve this question.

29

violation arising from the differential incentives would be to unwind the Board's final order pursuant to § 10, rather than to require redress for the unequal incentives.

¶ 54. As for the dissent's homage to local control, the dissent itself acknowledges that the state is and always has been responsible for determining that level of control and that it is within the province of the Legislature, not this Court, to make policy determinations in that regard. See Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012) (stating that courts "are vested with the authority to interpret the law" but "possess neither the expertise nor the prerogative to make policy judgments" entrusted to members of legislative branch, "who can be thrown out of office if the people disagree with them").

Affirmed.

FOR THE COURT:

_____
Chief Justice

¶ 55. **EATON, J., dissenting.** At its heart, this is a case of statutory interpretation. Did the Legislature give the Board of Education the authority to direct school districts to involuntarily change their structures and, if so, under what conditions? The Board and the majority interpret the authorizing legislation to allow forced mergers when possible or practicable. To reach this interpretation the majority ignores critical language in the statute that authorizes involuntary changes to district structure only "where necessary" to achieve the goals of the statute. Because the language of Act 46 is plain in requiring the Board to find that merger of particular school districts is necessary, not just possible and practicable, I would remand to the Board to reconsider the Secretary's proposal in light of that standard. To allow involuntary mergers to proceed for towns where it is not necessary violates the intent of the statute and puts at risk the voices of small towns in the future education of their children.

¶ 56. I agree with the majority that the Legislature has the authority under the Vermont Constitution to delegate to the Agency and the Board the power to create, merge, or dissolve school districts as long as that delegation is accompanied by "reasonable standards to govern the achievement of [the] purpose and the execution of the power which it confers." In re B & M Realty, LLC, 2016 VT 114, ¶ 28, 203 Vt. 438, 158 A.3d 754 (quotation omitted); see Stowe Citizens for Responsible Gov't v. State, 169 Vt. 559, 561, 730 A.2d 573, 575 (1999) (mem.) (explaining that Legislature can delegate decisionmaking to municipality, but delegation is unconstitutional if it "is so vague and uncertain that, in exercising its discretion, the municipality must, in effect, make the law"). Therefore, the scope of the authority that the Legislature gave to the Board is important to answering the constitutional delegation question.[8] Here, the plain language of Act 46 requires that the Secretary and the Board recommend and adopt changes in school governance structures only where "necessary" to promote the goals of the statute. Any doubt about the Legislature's intent is resolved by considering the overall structure and purpose of the statute, which does not mandate merger in all instances, and Vermont's history of giving local voters control over district structure and schools.

¶ 57. As detailed by the majority, the Legislature enacted Act 46[9] to address a statewide decline in student enrollment and parallel increase in education costs. 2015, No. 46, § 1. The Legislature found that the existing variety of governance structures of school districts resulted in school districts that were not achieving economies of scale and lacked flexibility. Id. § 1(e). The law therefore sought to "move the State toward sustainable models of education governance" that provided equity in the quality and variety of education, led to good educational outcomes,

_____

[8] I do not reach the question of whether the statute as interpreted by the majority amounts to an overly vague and therefore unconstitutional delegation.

[9] I refer throughout this dissent to Act 46, recognizing that Act 49 altered some of its provisions.

31

maximized efficiencies, promoted transparency, and delivered education at a good cost value. Id. § 2. The Legislature made clear that it did not intend to close schools but to provide expanded educational opportunities. Id. § 3. The Legislature provided definitions for preferred education governance structures for educational districts and alternative structures. Id. § 5. The law encouraged the formation of preferred governance structures through voluntary mergers by providing financial incentives. Id. §§ 6, 7.

¶ 58. Under the statute, districts that did not enter voluntary mergers and did not have a preferred structure were required to submit a proposal (either individually or jointly with other districts), explaining the district's plan to meet the goals of the statute. Id. § 9. The statute instructed the Secretary of Education to review the proposals and

> develop, publish on the Agency of Education's website, and present to the State Board of Education a proposed plan that, to the extent necessary to promote the purpose stated at the beginning of this subsection (a), would move districts into the more sustainable, preferred model of governance set forth in Sec. 5(b) of this act (Education District).

Id. § 10(a)(2) (emphasis added). The statute indicated that "[i]f it is not possible or practicable to develop a proposal that realigns some districts, where necessary, into an Education District in a manner that adheres to the protections of [the rest of the Act], then the proposal may also include alternative governance structures as necessary." Id. (emphases added).

¶ 59. The statute then directed the State Board of Education to review the Secretary's plan and "approve the proposal either in its original form or in an amended form that adheres to the provisions of subsection (a) of this section and . . . publish on the Agency's website its order merging and realigning districts and supervisory unions where necessary." Id. § 10(b) (emphasis added).

¶ 60. It is the import of the word "necessary" in § 10 that is the subject of this dissent. As is often repeated, this Court's primary goal in interpreting a statute is "to implement the intent

of the Legislature by giving effect to the plain language of the statute." State v. Reed, 2017 VT 28, ¶ 20, 204 Vt. 399, 169 A.3d 1278. Only when the meaning of a statute is ambiguous does the Court look elsewhere to determine intent. Id. Here, the language of the statute is unambiguous. The Secretary is directed to propose a plan that changes governance structures to a preferred structure "where necessary," and use an alternative governance structure "as necessary." 2015, No. 46, § 10(a)(2). Furthermore, the Board, in reviewing the Secretary's proposal, is mandated to approve the proposal "where necessary." Id. § 10(b). The language is not ambiguous. There is no alternative meaning of the word "necessary" that creates confusion about its meaning and necessitates further investigation into the Legislature's intent. Therefore, I would read the statute as written to mandate involuntary changes in school district structure only when necessary.

¶ 61. The majority's interpretation that the Legislature did not create a "necessary" threshold fails for several reasons. First, to reach this conclusion the majority essentially reads the word "necessary" out of the statute. In construing language in a statute, "[t]his Court must presume that all language in a statute was drafted advisedly, and that the plain ordinary meaning of the language used was intended." Comm. to Save the Bishop's House, Inc. v. Med. Ctr. Hosp. of Vermont, Inc., 137 Vt. 142, 153, 400 A.2d 1015, 1021 (1979) (citation omitted). In total, the word "necessary" appears four times in § 10, and each time in reference to deciding whether to alter the existing structure of districts and supervisory unions. To reach its result, the majority must conclude that the Legislature inserted the word necessary in four different locations wholly unnecessarily and superfluously. I cannot make such a presumption.

¶ 62. Second, the language of the statute, and in particular the purpose statement, does not support the majority's conclusion that incorporating a necessary requirement would be at odds with the Legislature's overall intent underlying Act 46. The majority deems that the goal of the Act was to merge school districts, but the language of the statute reveals a much broader and more nuanced purpose. The Legislature indicated that its goal was to create "sustainable models of

education governance." 2015, No. 46, § 2. The Legislature did not, as asserted by the majority, conclude that "merging districts into sustainable governance structures was necessary to achieve the goals stated, including economies of scale and greater educational opportunities." Ante, ¶ 23. The statute does not mandate that merger is the sole means to resolve the existing challenges in education and funding. Instead, the Legislature recognized that the best outcome for a district, even one not currently in a preferred governance structure, might not require a change in its governance structure. The Legislature adopted a nuanced approach to mandatory changes in structure, including merging or realignment. The Legislature indicated that the statute was "designed to encourage and support local decisions and actions" that would lead to equity and quality education, among other things. 2015, No. 46, § 2. The Legislature recognized that merging districts might achieve its goals, but that merger was not the only mechanism to achieve the outcomes it sought. The majority's assertion that Act 46 presumed that merger was necessary in every instance is also at odds with the overall structure of the statute, which allows districts to make proposals for alternative structures. If merger were always necessary, there would be no reason for school districts to prepare a proposal in support of an alternative structure.

¶ 63. The statute strikes a balance between encouraging changes where it would help attain the goals of the statute, and allowing alternative approaches where changes in structure would not help achieve educational and efficiency goals. This balance is reflected in the statute's purpose statement and the statute's individualized approach. This Court's role is not to conduct its own balancing of the policy interests underlying the law but to give effect to the decision made by the Legislature. Doyle v. City of Burlington Police Dep't, 2019 VT 66, ¶ 12, __ Vt. __, 219 A.3d 326 ("Our role is to interpret the law to give effect to the Legislature's intent, not to impose our policy preferences on the public." (quotation omitted)). To adopt a one-size-fits-all approach would contradict the language and tenor of the statute.

¶ 64. Moreover, giving full effect to the word "necessary" in the statute is also consistent with the history in this state of local control over school governance. Certainly, as this Court has held, the obligation for providing public education belongs to the state. Brigham v. State, 166 Vt. 246, 259, 692 A.2d 384, 392 (1997) (per curiam). The state is ultimately responsible for education but can delegate to local towns and cities "the authority to finance and administer the schools within their borders." Id. at 264, 692 A.2d at 395. The Legislature has recognized through other statutes the importance of local control and decisionmaking over a district's governance structure. For example, in Act 46, before resorting to involuntary mergers, the statute first encourages voluntary ones and these all involve a town-wide vote. 2015, No. 46, §§ 6, 7. Other statutes allowing the establishment of a new school district require a vote of the affected districts. See, e.g., 16 V.S.A. § 706d. Given that formation of a new district usually follows from a town-wide decision, it makes sense that the Legislature would deviate from this practice only when necessary.

¶ 65. This Court must enforce statutes as the Legislature has written them, not as it would have been more expedient or straightforward in hindsight to have written them. Given the Legislature's clear directive that involuntary changes to school district structure should be made only "where necessary," I would reverse the Board's decision and remand for findings of necessity. To condone mergers and redistricting without such a finding violates the plain meaning of the statute and diminishes the voices of small towns in how their districts will be run in the future without any finding that such a result is necessary. The Board reasoned that mergers should go forward when possible and practical without examining whether those districts were already meeting the goals of the statute and therefore merger was unnecessary.

¶ 66. Our Constitution provides that "a competent number of schools ought to be maintained in each town unless the general assembly permits other provisions for the convenient instruction of youth." Vt. Const. ch. II, § 68. For over 240 years control over how to run districts has been in the hands of local school districts and the schools have been a source of pride and a

focal point of our towns. When small districts are involuntarily merged, their votes are diluted, and they lose control over education in their towns. This is contrary to our history and to the express provisions of Act 46, which require a necessity finding. Many things are possible and practicable. That does not make them necessary as intended by the Legislature. At the very least, the communities who are the subject of forced mergers have the right to know why the Board felt those mergers were necessary.

¶ 67.    I realize the need for efficiencies of scale underlying Act 46, but the Legislature did not seek efficiency at any cost. The Legislature recognized that it was best to only merge districts when necessary to achieve educational and efficiency goals. Without this condition, discarding local control and forcing merger upon school districts and communities that don't want it and that have not been found to need it is a wholesale change which may or may not accomplish its purpose, but surely represents the irrevocable end of many local school districts and their local schools. I am reminded of the words of Joni Mitchell:

> Don't it always seem to go
> That you don't know what you've got
> 'Til it's gone

Joni Mitchell, <u>Big Yellow Taxi</u>

¶ 68.    For the foregoing reasons, I dissent.

¶ 69.    I am authorized to state that Justice Cohen joins in this dissent.

_____
Associate Justice

36